266 N.J. Super. 349 (1993)
629 A.2d 922
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
DAMON KENNETH DUNNS, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued April 21, 1993.
Decided July 7, 1993.
*352 Before Judges KING, LANDAU and HUMPHREYS (temporarily assigned).
*353 Charles E. Viel, Assistant Deputy Public Defender, argued the cause for appellant (Zulima V. Farber, Public Defender of New Jersey, attorney).
Jon Michael Reilly, Assistant Prosecutor, argued the cause for appellant (Michael Brooke Fisher, Cumberland County Prosecutor, attorney).
The opinion of the court was delivered by KING, P.J.A.D.
This case presents a question of fundamental fairness arising under the Double Jeopardy Clauses of the State and federal constitutions. N.J. Const. art. I, ¶ 11; U.S. Const. amend. V; see N.J.S.A. 2C:1-9(d)(3). Defendant's first trial in 1989 ended in an acquittal on charges of attempted murder and terroristic threats. He was convicted on charges of aggravated assault and possession of a weapon for an unlawful purpose. We reversed these convictions in January 1991 because of trial error. His retrial in 1992 on the assault and weapons charges was aborted by a mistrial when the State's key witness went to jail for contempt, and eventually to a psychiatric ward, for refusing to testify against defendant under a grant of immunity. The 1992 trial started on January 14, was adjourned sine die on January 16 when the key witness refused to testify, and ended in a mistrial on April 10 when the judge in frustration finally discharged the remnants of the jury.
The State again sought to retry defendant. The judge denied defendant's motion to dismiss the indictment on double jeopardy grounds. On leave to appeal, we conclude that on the unique record presented, New Jersey's double jeopardy and fundamental fairness doctrine bars another trial of this defendant.

I
The case has an unusual procedural background which we recite in detail. In November 1988 the State obtained an indictment in Cumberland County charging defendant Dunns with attempted *354 murder, N.J.S.A. 2C:5-1 and N.J.S.A. 2C:11-3(a) (count one); terroristic threats, N.J.S.A. 2C:12-3(a) (count two); second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(2) (count three); fourth-degree aggravated assault, N.J.S.A. 2C:12-1(b)(4) (count four); and second-degree possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count five).
On June 29, 1989, during the first jury trial, the judge granted defendant's motion for judgment of acquittal on count two, terroristic threats. The jury acquitted defendant on count one, attempted murder, but convicted him on the remaining counts, third- and fourth-degree aggravated assault and possession of a weapon for an unlawful purpose. The judge then sentenced defendant to a five-year term with a three-year parole ineligibility term on count three; a concurrent 18-month term on count four; and a concurrent five-year term with a three-year parole ineligibility on count five. Defendant served 20 months of this sentence before the 1989 convictions were reversed and he raised bail pending retrial.
Before the 1989 trial, the judge conducted an Evid.R. 8 hearing to determine whether the alleged victim, Lynn Elliott, would testify. She had been romantically involved with defendant at the time of the episode. She refused to answer the assistant prosecutor's questions at the Evid.R. 8 hearing and was found in contempt of court. During the course of trial, the judge conducted another Evid.R. 8 hearing and concluded that certain statements made by Elliott to the police were admissible on the State's case under the "excited utterance" exception to the hearsay rule. Evid.R. 63(4). On January 30, 1991 we reversed defendant's 1989 convictions on the ground that the judge erred in admitting Elliott's statement to police into evidence as an "excited utterance" and we remanded for a new trial. As noted, by this time defendant had served 20 months before he was released pending his new trial.
On January 13, 1992, a Monday, the jury selection process for the retrial began. On that date, the judge conducted another Evid.R. 8 hearing to determine whether the victim, Elliott, would *355 testify for the State. Elliot said that she would not testify and invoked her Fifth Amendment privilege against self-incrimination.
On January 14 jury selection was completed, the jury was sworn, and the trial began. On Thursday, January 16, after Trooper Coffin had completed his testimony, the State announced that it had obtained a grant of statutory immunity for Elliott. On that date, the judge signed an order compelling Elliott to testify pursuant to our "use immunity" statute, N.J.S.A. 2A:81-17.3. Elliott was called to the stand by the State, refused to answer the trial prosecutor's questions, and was held in contempt of court. The judge ordered Elliott held in the Cumberland County jail without bail and adjourned the trial indefinitely. He did not discharge the jury.
The matter stagnated with the jury "on call" until February 21, when the judge denied defendant's motion to enter a judgment of acquittal, to resume the trial, and to release Elliott from jail. Defendant sought leave to appeal the denial of these motions, which we denied on March 2.
On March 30 the judge again denied defendant's motions to resume the trial, for judgment of acquittal and for dismissal on the ground of double jeopardy. Defendant again sought leave to appeal, which we denied on April 7. On April 10 the judge declared a mistrial because of juror hardship. He ordered the release of Elliott from jail after granting the mistrial.
Defendant then filed a motion to dismiss the indictment on the grounds of double jeopardy pursuant to the State and federal constitutions and N.J.S.A. 2C:1-9(d). On August 10 the judge denied the motion. On August 25 defendant filed a notice of motion for leave to appeal from the judge's interlocutory order denying defendant's motion to dismiss the indictment on double jeopardy grounds. On September 24 we denied defendant's motion for leave to appeal from denial of that motion. On October 9 defendant moved for leave to appeal to our Supreme Court from our denial of interlocutory relief. On December 8 our Supreme *356 Court granted defendant's motion for leave to appeal and remanded to us to consider the matter on the merits.

II
The case involves the tortuous history of the State's prosecution of defendant, Damon Dunns, a State Corrections Officer, who allegedly shot at and slightly injured his "girlfriend" Lynn Elliott on June 30, 1988.[1] At the first trial in June 1989 Elliott refused to testify for the State. She recanted her prior statement to the State Police which had inculpated defendant Dunns and testified *357 on his behalf. She claimed that her prior statement inculpating Dunns was a spiteful lie, made because she was mad at him. The forensic evidence was inconclusive on Dunns's guilt. The State's use of Elliott's prior statement as an "excited utterance" hearsay exception at the first trial sparked the reversal of the aggravated assault and illegal use of a weapon convictions. The jury acquitted defendant of the attempted murder.
As noted, jury selection for the 1992 retrial began on January 13, 1992. On that date, at an Evid.R. 8 hearing, Elliott said that she still would not testify for the State, and for the first time in the case invoked her "Fifth Amendment right to remain silent." At that hearing, her counsel explained to her that if she testified as the State desired, she could subject herself to prosecution for perjury or false swearing because of her inconsistent sworn statement to the police and her testimony at the 1989 trial.
The judge ruled that Elliott's fear of self-incrimination was genuine and that she could properly assert her right against self-incrimination. The judge also commented that the State had known "full well" that Elliott, who had refused to testify at the first trial, might possibly invoke her constitutional right to remain silent and that an application for immunity should have been made before the start of the second trial. The State represented that it intended to embark on the "cumbersome process" of obtaining a grant of "use immunity" for Elliott. On January 14, the jury selection process was completed and the jury was sworn.
On January 16, the prosecutor informed the judge that he had obtained a petition to compel testimony, pursuant to N.J.S.A. 2A:81-17.3,[2] granting Elliott immunity with regard to any potential *358 perjury or false swearing charges. Because the grant of immunity precluded Elliott's assertion of her Fifth Amendment rights, the judge signed an order compelling her to testify. When called to the stand, Elliott refused to testify despite the grant of immunity. The State requested that the judge hold her in "contempt of court." The judge found Elliott in "contempt under R. 1:10" and committed her to the custody of the Sheriff without bail. He told her that she would be released from incarceration only when she communicated her willingness to testify. He then adjourned the trial until January 21, 1992 when he intended to provide Elliott another opportunity to testify. On January 21, 1992, five days after her incarceration, Elliott was brought back to court and again refused to testify. The judge continued the contempt order and remanded Elliott to the custody of the Sheriff, again without bail.
On the following day, January 22, Elliott again refused to testify. The judge told her that he planned on "simply putting Mr. Dunns's case on hold until you decide to testify." Defense counsel requested that the case go forward, claiming that it was clear Elliott would never testify, that the State had known prior to trial that this type of delay was likely, and that the resulting delay would deprive Dunns of a fair and speedy trial. Defense counsel also moved for dismissal, arguing that the success of the State's *359 case depended on Elliott's testimony. The State argued that it had been unaware before trial that Elliott would assert her right to remain silent and that the delay had not caused any prejudice to the defendant. The judge ruled that he would adjourn the trial until Elliott testified, stating:
The State also has a right to call her and to present her testimony. The State has a right to compulsory process. If Ms. Elliott chooses for whatever reason, and I certainly don't understand it at this point, chooses not to comply with the subpoena and not to comply with the court orders, the contempt finding will continue. She may be remanded to the county jail. We're not going to [go forward with] the trial.
The State and the judge tried again two weeks later on February 3, 1992, and again Elliott refused to testify. The judge, emphasizing that Elliott had "the key to the jail in her hands," sent her back into custody, and again adjourned the trial until February 18.
On February 18 Elliott again refused to testify. This time she was represented by counsel, who argued that since one month in jail had failed to motivate her to testify, her incarceration had become penal in nature. The judge ruled that the order of contempt would continue and that the imprisonment might still have the coercive effect of encouraging her to testify.
Also on February 18, 1992 the judge stated that he planned to bring Elliott into court on a weekly basis "as long as I have twelve jurors who can continue in the case." The jurors were kept informed of the status of the case by taped messages left on the courthouse answering machine. Each week when jurors called to find out if they must return to court, the message on the answering machine gave the instruction to call back the following week and that if continued participation proved a hardship, a juror should notify the judge's secretary. At that time, the judge concluded that thirteen jurors were still available.
On February 24, after spending forty days in jail, Elliott again expressed her refusal to testify. On this occasion, defense counsel again requested that the judge refuse to grant a continued adjournment; he also raised the issue of double jeopardy. The *360 judge denied these motions and found that the imprisonment order might still be efficaciously coercive. By this date, the number of available jurors had dropped to twelve.
Elliott was brought to court on March 2, March 16, and March 30. On each occasion she stood by her refusal to testify. Each time she was sent back to county jail. The judge still believed that the incarceration could have a possible coercive impact. Also, on each occasion, defense counsel reargued his motion for dismissal while the State continued to move for adjournment.
On April 1 about ten weeks after Elliott's imprisonment, the judge on his initiative conducted an emergency hearing because of the deterioration of Elliott's mental health. The judge ordered Elliott transferred to the Bridgeton Hospital's Psychiatric Unit on a furlough until the doctors there decided when she was ready for a medical discharge, at which time she would be returned to the county jail.
On April 10 Elliott was again brought before the judge. On that date, the judge informed the parties that three additional jurors had indicated that their continued participation would create a hardship and that he intended to excuse those jurors. This reduced the number of available jurors to nine. Defense counsel said that he would not consent to a jury panel of fewer than twelve members, R. 1:8-2. He also said that he was not seeking a mistrial. The judge declared a mistrial, sua sponte, and released Elliott from jail. The judge then set a new trial date.
On July 31 the judge conducted a hearing on defendant's motion to dismiss the indictment on the grounds of double jeopardy, constitutionally and statutorily, pursuant to N.J.S.A. 2C:1-9(d)(3). The motion was denied.

III
Defendant contends that his aborted 1992 trial was the result of inexcusable neglect by the prosecution. He claims that the State should have known of the witness's reluctance to testify, should *361 have obtained the grant of immunity before, not during, the trial and should be barred from proceeding with a retrial, actually a third trial, because the State's case literally collapsed in the courtroom. The State contends that it was without fault or lack of foresight in this unfortunate matter. The State, with some merit, contends that it could never have been sure that Elliott would not testify under a grant of use immunity until the "moment of truth," when she was placed on the witness stand before the jury and refused to testify.
The State observes that the timing of when immunity actually was sought and obtained had nothing to do with the abortion of the 1992 trial by mistrial because Elliott obviously would have never testified in any trial in early 1992, no matter when the immunity was obtained. We also recognize that the State cannot be faulted for the witness's probable motive not to testify against her former, if not present, "boyfriend" whether out of fear or favor. But the record is barren of any real proof or articulation of reason for Elliott's contumacious silence. The State insists that a third trial should proceed to insure "the integrity of the trial process." The defendant retorts that there is no proof in the record that he did anything to undermine the State's case at the 1992 trial. In this, he is correct. We agree that "enough is simply enough," especially since defendant has already served 20 months in State prison. The indictment will be dismissed.
We must dismiss an indictment if prosecution would violate the defendant's constitutional right of freedom from double jeopardy. State v. Abatti, 99 N.J. 418, 425, 493 A.2d 513 (1985), citing State v. Barnes, 84 N.J. 362, 420 A.2d 303 (1980). The double jeopardy clause of the Fifth Amendment of the United States Constitution is applicable to the states through the Fourteenth Amendment. Benton v. Maryland, 395 U.S. 784, 794, 89 S.Ct. 2056, 2062, 23 L.Ed.2d 707, 716 (1969); State v. Farmer, 48 N.J. 145, 168, 224 A.2d 481 (1966), cert. denied, 386 U.S. 991, 87 S.Ct. 1305, 18 L.Ed.2d 335 (1967). Article I, paragraph 11 of the New Jersey Constitution provides: "No person shall, after acquittal, be *362 tried for the same offense," while the Fifth Amendment to the federal constitution states: "nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb." Although the New Jersey clause is textually narrower in scope, the double-jeopardy protections provided in the State and federal constitutions are essentially coextensive in application. State v. Koedatich, 118 N.J. 513, 518, 572 A.2d 622 (1990); State v. Dively, 92 N.J. 573, 578, 458 A.2d 502 (1983); State v. Rechtschaffer, 70 N.J. 395, 404, 360 A.2d 362 (1976); State v. Farmer, supra, 48 N.J. at 168, 224 A.2d 481; State v. DeMarco, 211 N.J. Super. 421, 425, 511 A.2d 1251 (App.Div. 1986); State v. Blanks, 190 N.J. Super. 269, 274, 463 A.2d 359 (App.Div. 1983).
The doctrine of double jeopardy, which protects defendants from a second prosecution for the same offense after certain terminations of an initial trial, is based on principles of fundamental fairness:
The underlying idea, one that is deeply ingrained in at least the Anglo-American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty. [Green v. United States, 355 U.S. 184, 187-88, 78 S.Ct. 221, 223, 2 L.Ed.2d 199, 204 (1957).]
See State v. Abatti, supra, 99 N.J. at 430, 493 A.2d 513.
In the case of a jury trial, jeopardy attaches when the jury is impaneled and sworn. Crist v. Bretz, 437 U.S. 28, 37-38, 98 S.Ct. 2156, 2161-62, 57 L.Ed.2d 24, 33 (1978); State v. Lynch, 79 N.J. 327, 341, 399 A.2d 629 (1979). From that point, a defendant is entitled to have his trial proceed to its normal conclusion before that particular tribunal. Wade v. Hunter, 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974, 978 (1949); State v. Rechtschaffer, supra, 70 N.J. at 404, 360 A.2d 362; State v. Farmer, supra, 48 N.J. at 169, 224 A.2d 481.
The Double Jeopardy Clause does not create an absolute bar in every case of retrial. Even when jeopardy has attached, a trial judge may declare a mistrial and discharge a jury without *363 foreclosing defendant's reprosecution on the same charges if the mistrial was declared at the request of or with the acquiescence of the defendant. Oregon v. Kennedy, 456 U.S. 667, 672, 102 S.Ct. 2083, 2087, 72 L.Ed.2d 416, 422 (1982); United States v. Dinitz, 424 U.S. 600, 607-10, 96 S.Ct. 1075, 1079-81, 47 L.Ed.2d 267, 273-76 (1976). Even absent such consent, reprosecution is permissible if there was a "manifest necessity" for the mistrial "or the ends of public justice would otherwise be defeated." United States v. Perez, 22 U.S. (9 Wheat.) 579, 580, 6 L.Ed. 165 (1824); see State v. Abatti, supra, 99 N.J. at 426, 493 A.2d 513. In State v. Romeo, 43 N.J. 188, 195, 203 A.2d 23 (1964), cert. denied, 379 U.S. 970, 85 S.Ct. 668, 13 L.Ed.2d 563 (1965), our Supreme Court set out general guidelines for determination of whether the discharge of the jury prior to verdict is justified:
The law in this State is thoroughly established that, while the principles of double jeopardy may be applicable to bar a second trial where the first has been terminated short of verdict, yet "* * * if the trial was terminated or the jury discharged before verdict because of incapacitating illness of the judge or a juror or jurors or of the defendant, or misconduct or disqualification of some members of the jury, or on account of an untoward incident that renders a verdict impossible, or some undesigned matter of absolute necessity, or the failure of the jury to agree upon a verdict after a reasonable time for deliberation has been allowed, subsequent prosecution for the offense [is] not barred," for reasons of justice and the public interest. [Id., quoting State v. Williams, 30 N.J. 105, 121, 152 A.2d 9 (1959).]
Allowing for retrial under such circumstances "accords recognition to society's interest in giving the prosecution one complete opportunity to convict those who have violated its laws." Richardson v. United States, 468 U.S. 317, 324, 104 S.Ct. 3081, 3085, 82 L.Ed.2d 242, 250 (1984), quoting Arizona v. Washington, 434 U.S. 497, 509, 98 S.Ct. 824, 832, 54 L.Ed.2d 717, 730 (1978); see also State v. Gallegan, 117 N.J. 345, 351-52, 567 A.2d 204 (1989). Given the conflicting concerns involved in any "manifest necessity" assessment, the State must shoulder the "heavy" burden of demonstrating that a mistrial was required by a high degree of necessity, in order to avoid a double jeopardy bar. State v. Gallegan, supra, 117 N.J. at 352, 567 A.2d 204, quoting United States v. McKoy, 591 F.2d 218, 222 (3d Cir.1979); see *364 Arizona v. Washington, supra, 434 U.S. at 505, 98 S.Ct. at 830, 54 L.Ed.2d at 728.
The Legislature in effect adopted the test enunciated in State v. Romeo, supra, 43 N.J. at 195-96, 203 A.2d 23, in enacting N.J.S.A. 2C:1-9, which provides in pertinent part:
A prosecution of a defendant for a violation of the same provision of the statutes based upon the same facts as a former prosecution is barred by such former prosecution under the following circumstances:
....
d. The former prosecution was improperly terminated. Except as provided in this subsection, there is an improper termination of a prosecution if the termination is for reasons not amounting to an acquittal, and it takes place after the jury was impaneled and sworn or, in a trial before a court without a jury, after the first witness was sworn but before findings were rendered by the trier of facts. Termination under any of the following circumstances is not improper:
....
(3) The trial court finds that the termination is required by a sufficient legal reason and a manifest or absolute or overriding necessity.
The Code Commentary expressly rejected any attempt at categorizing circumstances justifying a declaration of a mistrial for "manifest necessity," as the Model Penal Code had presumed to do, but referred to the examples set forth in State v. Romeo. The New Jersey Penal Code, Volume II: Commentary, Final Report of the N.J. Criminal Law Revision Commission (1971); see also Cannel, New Jersey Criminal Code Annotated, comment 6 on N.J.S.A. 2C:1-9, at 49-50 (1992). The statutory definition of "double jeopardy" is essentially coextensive with the constitutional concept for purposes of this case.
Both the United States and the New Jersey Supreme Courts have recognized that it is impossible to define all of the circumstances where there is sufficient reason to declare a mistrial. United States v. Perez, supra, 22 U.S. (9 Wheat.) at 580, 6 L.Ed. 165; State v. Farmer, supra, 48 N.J. at 170-71, 224 A.2d 481 ("[T]here can be no cataloguing of events or conduct which ... will require a holding of double jeopardy when a mistrial is ordered without the defendant's consent"); see 3 Wayne R. LaFave & Jerold H. Israel, Criminal Procedure § 24.2(b), at 74 *365 (1984) ("Examination of state and federal appellate opinions on the subject of `manifest necessity' is not an especially rewarding undertaking.... Little consensus exists among the courts as to the factors which should be analyzed...."). Each case must necessarily turn on particular facts. Illinois v. Somerville, 410 U.S. 458, 464, 93 S.Ct. 1066, 1070, 35 L.Ed.2d 425, 431 (1973); United States ex rel. Russo v. Superior Court of New Jersey, 483 F.2d 7, 13 (3d Cir.1973); State v. Farmer, supra, 48 N.J. at 177, 224 A.2d 481.
The witness in the case before us, Elliott, rather clearly indicated at the Evid.R. 8 hearing before trial that she would not testify for the State. Rather than seeking a postponement, the State chose to proceed with trial while simultaneously securing "use immunity" for Elliott. But, once obtained, the immunity tool did not work. The defendant properly continued to insist on his right to proceed before this jury. The witness then sat in jail for 3 1/2 months. The State's case foundered and finally sunk. At oral argument, the State conceded that it could have gone ahead with the trial on the charge of possession of a weapon for an unlawful purpose (N.J.S.A. 2C:39-4(a)) based on statements made by defendant to the police and at the first trial, but chose not to proceed on the weapons charge alone.[3] Dunns apparently told the police that he shot the firearm into the sky in frustration. Obviously, the State could not have proceeded on the aggravated assault charge without Elliott's testimony. In the end, the judge had no choice but to discharge the jury.
Defendant then moved to dismiss the indictment on double jeopardy grounds. The judge denied the motion, explaining that since the number of jurors had shrunk to nine and defendant would not consent to that number, as was his right pursuant to R. 1:8-1, there existed sufficient legal reason to declare a mistrial pursuant to N.J.S.A. 2C:1-9(d)(3). The judge then addressed the *366 key question presented by defendant: "whether or not the actions of the State or inactions of the State amount to inexcusable neglect, therefore negating the manifest or absolute or overriding necessity requirement." The judge concluded that the State's conduct did not amount to inexcusable neglect, reasoning that the State did not know for certain before the 1992 trial if Elliott would refuse to testify. He said that whether the delays and eventual mistrial caused by Elliott's refusal to testify "could have been prevented by some other action of the State is speculative." The judge concluded that although the prosecutor's conduct may be subject to some justified second-guessing it did not equate with inexcusable neglect which barred a retrial.
"When, as in this case, the trial court acts, sua sponte, over the objections of both parties, propriety of the mistrial depends upon the sound exercise of the court's discretion, to be utilized `only in those situations which would otherwise result in manifest injustice.'" State v. Rechtschaffer, supra, 70 N.J. at 406, 360 A.2d 362, quoting State v. DiRienzo, 53 N.J. 360, 383, 251 A.2d 99 (1969). Our Supreme Court has suggested the following analysis where a case centers on the propriety of a trial judge's sua sponte declaration of a mistrial:
Did the trial court properly exercise its discretion so that a mistrial was justified? Did it have a viable alternative? If justified, what circumstances created the situation? Was it due to prosecutorial or defense misconduct? Will a second trial accord with the ends of public justice and with proper judicial administration? Will the defendant be prejudiced by a second trial, and if so, to what extent? [State v. Rechtschaffer, supra, 70 N.J. at 410-11, 360 A.2d 362.]
Moreover, if a procedural error makes reversal on appeal a certainty, it would not serve the "ends of public justice" to proceed with the trial. Illinois v. Somerville, supra, 410 U.S. at 464, 93 S.Ct. at 1070, 35 L.Ed.2d at 431.
Under R. 1:8-2(a), a jury may consist of fewer than twelve jurors only if the parties so stipulate and the judge gives approval. Where a party refuses to consent to a jury of fewer than 12 members, the judge may properly declare a mistrial without precluding future prosecution on double jeopardy grounds. See *367 State v. Romeo, supra, 43 N.J. at 195-200, 203 A.2d 23 (where State refused to stipulate to 11-member jury after twelfth juror was removed by necessity during first trial, declaration of mistrial was supported by "sufficient legal reason" and was not a bar to a second trial); United States v. Ruggiero, 846 F.2d 117, 124 (2d Cir.), cert. denied, 488 U.S. 966, 109 S.Ct. 491, 102 L.Ed.2d 528 (1988) (where the judge properly dismissed three jurors leaving a total of eleven and neither the State nor defendants expressed a willingness to continue, declaration of mistrial was "manifestly necessary"); United States v. Holland, 378 F. Supp. 144, 151-52 (E.D.Pa.), aff'd, 506 F.2d 1050 (3d Cir.1974), cert. denied, 420 U.S. 994, 95 S.Ct. 1433, 43 L.Ed.2d 676 (1975) (where twelfth juror was dismissed during deliberations due to emotional and physical health concerns and defendants refused to proceed to verdict with eleven jurors, there was manifest necessity for declaration of mistrial); see also LaFave & Israel, supra, § 24.2(b), at 75-76.
In the present case, several jurors were dismissed because of personal hardships created by the unexpected increase in the length of the "trial." Although the State was willing to continue to outwait Elliott with nine jurors, defendant understandably refused to stipulate to that number, as was his right. Thus at loggerheads, clearly the judge's sua sponte declaration of mistrial was not an abuse of his discretion; proceeding with nine jurors would obviously "make reversal on appeal a certainty." However, defendant urges that, under the facts of this case, "the granting of the mistrial was necessitated by the inexcusable neglect of the State and the double jeopardy bar applies."
Defendant does not criticize the judge for granting the mistrial or even for repeatedly postponing the trial. Rather, he asks us to focus on what he believes was the primary cause of the delay and subsequent mistrial, i.e., the State's neglect in allowing the jury to be impaneled and sworn without ensuring that its key witness, Elliott, would testify. He argues:
The delay was due to the inexcusable neglect of the State in failing to obtain immunity prior to commencement of the trial or in failing to request a postponement *368 of the trial after Lynn Elliott made known at the Rule 8 hearing that she would refuse to testify at trial.
Defendant contends that allowing a retrial would improperly afford the State an opportunity to strengthen its case "by correcting deficiencies which resulted from prosecutorial neglect and/or oversight," and that the State's repeated requests for adjournments revealed a "conscious effort" to achieve a mistrial because juror hardship was an inevitable result of the extended delay.
The prosecutorial neglect alleged is apparently based on: (1) the State was aware that Elliott was a known reluctant witness, evident from her refusal to testify for the State at the original trial; (2) the State was also aware that there was a significant likelihood that Elliott would invoke her privilege against self-incrimination, because her testimony would necessarily conflict with either her statement to police or her testimony at the 1989 trial thus exposing her to perjury or false swearing charges; (3) even without that constructive knowledge, the State actually became aware of Elliott's intention to assert her right to remain silent at the Evid.R. 8 hearing held prior to the completion of jury selection; and (4) despite this knowledge, the State chose not to pursue and secure a grant of immunity for Elliott until after the jury was impaneled and sworn.
Defendant claims that the State should have requested a postponement before the jury was picked in order to obtain a grant of immunity: "If the State had obtained this grant of immunity prior to the jury being sworn and Ms. Elliott had refused to testify, then the Court could have discharged the jury that had been selected without subjecting Dunns to a second trial." However, if the procedure suggested by defendant was more appropriate than that used by the State, defendant probably would never have been subjected to the January 1992 trial, let alone a third trial after the jury was discharged. The case would probably still be awaiting trial a third time or have been dismissed on speedy trial grounds.
The case law on which defendant relies in his assertion that the mistrial in this case was not manifestly necessary suggests the *369 importance of factors that are not clearly present in this case: (1) the possibility that the procedure complained about could lend itself to prosecutorial manipulation, (2) the availability of more practical alternatives than the declaration of a mistrial, and (3) whether the mistrial was declared for the purpose of permitting the State to strengthen its case. For instance, in Downum v. United States, 372 U.S. 734, 83 S.Ct. 1033, 10 L.Ed.2d 100 (1963), a witness did not appear on the day of trial. The prosecutor had issued a subpoena for the witness but he knew that the witness had not been located as of the day before trial. Soon after the jury was sworn, the prosecution requested and was granted a mistrial, over defendant's objections. At retrial the defendant was convicted. The federal Supreme Court reversed the conviction, holding that the second trial was barred because the failure of the prosecutor to locate the witness did not amount to "manifest necessity." Id. at 737-38, 83 S.Ct. at 1035-36, 10 L.Ed.2d at 103. The Court emphasized the fact that the prosecution was not adequately prepared, could have ensured the witness's availability, and the mistrial served to benefit the prosecution by giving additional time to search for the witness. Ibid.
In 1978, in Illinois v. Somerville, supra, 410 U.S. at 469, 93 S.Ct. at 1072, 35 L.Ed.2d at 434, where a mistrial prompted by a defective indictment was held not to bar retrial, the Supreme Court distinguished Downum and suggested that the significance of the procedural defect lay not only in whether the prosecutor was at fault but also whether the prosecutor knew of and could have responded to the defect in some fashion, for that lack of action creates a concern over "prosecutorial manipulation." See McNeal v. Hollowell, 481 F.2d 1145, 1150 (5th Cir.1973), cert. denied, 415 U.S. 951, 94 S.Ct. 1476, 39 L.Ed.2d 567 (1974); LaFave & Israel, supra, §§ 24.1, 24.2, at 66, 71-72 ("consideration must be given to whether allowing retrial for the kind of error or oversight which has occurred [e.g., absence of a prosecution witness] would invite `prosecutorial manipulation'").
*370 In State v. Stani, 197 N.J. Super. 146, 150, 484 A.2d 341 (App. Div. 1984), the State failed to "produce the victim of and the only witness to the alleged robbery to testify." The trial judge declared a mistrial and then dismissed the indictment. We found that the prosecutor should not have been given a second chance to prove a prima facie case. Id. at 151, 484 A.2d 341; see also State v. O'Keefe, 135 N.J. Super. 430, 436, 343 A.2d 509 (Law Div. 1975). Moreover, we concluded that the trial judge mistakenly exercised his discretion by not granting a short postponement, as requested by the State, which would have been a more practical alternative to terminating the trial. State v. Stani, supra, 197 N.J. Super. at 151, 484 A.2d 341; see State v. Leonard, 234 N.J. Super. 183, 190-92, 560 A.2d 711 (App.Div. 1989) (where municipal court judge declared a mistrial, sua sponte, over defense objections, because portions of trial proceedings had not been preserved on tape, "the defendant could not be retried as a result of the trial judge's inappropriate exercise of discretion").
In State in re D.P., 232 N.J. Super. 8, 14-17, 556 A.2d 335 (App.Div. 1989), we catalogued state and federal opinions on whether the premature termination of a trial would bar a retrial of the matter. See State v. Gallegan, supra, 117 N.J. at 352, 567 A.2d 204. The caselaw gathered there reinforces the importance of the consideration of alternatives to mistrial as a factor in the assessment of the propriety of the trial judge's declaration of a mistrial. Id. at 353, 567 A.2d 204; see Crawford v. Fenton, 646 F.2d 810, 817 (3d Cir.), cert. denied, 454 U.S. 872, 102 S.Ct. 344, 70 L.Ed.2d 178 (1981); United States v. McKoy, supra, 591 F.2d at 222 (3d Cir.1979); State v. Rechtschaffer, supra, 70 N.J. at 413, 360 A.2d 362. Also, our Supreme Court in State v. Gallegan, supra, 117 N.J. at 353, 567 A.2d 204, citing to State v. Laganella, 144 N.J. Super. 268, 287, 365 A.2d 224 (App.Div.), appeal dismissed, 74 N.J. 256, 377 A.2d 652 (1976), said courts must remember "that important interests other than those of defendant alone are involved in the trial of criminal cases," namely the public's interest in allowing the State one complete trial on the merits. In State v. Blanks, supra, 190 N.J. Super. at 278, 463 A.2d 359, we said "no authority suggests that the Double Jeopardy *371 Clause is totally a one-way street or a procedural straight-jacket not responsive to the unprovoked and unexpected misfortune of the State or to abuses by defendants or their witnesses."
Essentially, the general rule is that if the prosecutor was not in some way responsible for the witness's unavailability, manifest necessity exists for mistrial, so long as the witness is essential to the State's case and the judge's ruling is not otherwise an abuse of discretion. Where this is the case, the availability of other, more practical, alternatives to a mistrial seems to vary in importance among the various jurisdictions.
Citing to Downum, the Nevada Supreme Court has stated, "[i]f the prosecutor is in some way responsible for the unavailability of a critical prosecution witness, then a manifest necessity for mistrial is not established." State v. Connery, 100 Nev. 256, 679 P.2d 1266, 1267 (1984). In that case, the State's key witness, the victim of the crime, attempted suicide the night before the day trial was to start and was unavailable to testify. The State requested a continuance and in the alternative a mistrial. The judge granted a mistrial over defendant's objection. The Nevada Supreme Court held that, because the prosecutor was in no way responsible for the witness's absence and the State would be effectively prevented from presenting its case without her testimony, there was manifest necessity for the mistrial and a retrial was not barred. Id., 679 P.2d at 1268; see People v. DiMarco, 134 Misc.2d 863, 512 N.Y.S.2d 1004 (Sup.Ct. 1987) (mistrial was manifestly necessary where witness disappeared, prosecutor's office conducted an extensive search, and judge granted several continuances to allow for the search to continue). But see Commonwealth v. Ferguson, 446 Pa. 24, 285 A.2d 189, 191 (1971) (no manifest necessity where key witness to robbery reportedly was ill and unavailable to testify; granting a continuance a better alternative so that severity of illness could be determined). In United States ex rel. Gibson v. Ziegele, 479 F.2d 773, 775 (3d Cir.), cert. denied, 414 U.S. 1008, 94 S.Ct. 370, 38 L.Ed.2d 246 (1973), a key witness became too ill to *372 testify after trial began; because the illness would keep the witness unavailable for two weeks or more, the judge granted the prosecutor's motion for mistrial. The Third Circuit held that retrial was not barred because the witness's testimony was essential for the State's case and the illness was unexpected. Id. at 777; see United States v. Gallagher, 743 F. Supp. 745, 749 (D.Or. 1990) (manifest necessity exists where key witness unexpectedly refused to testify after placed on the stand).
The facts of the case before us are somewhat similar to those in United States v. Shaw, 829 F.2d 714 (9th Cir.1987), cert. denied, 485 U.S. 1022, 108 S.Ct. 1577, 99 L.Ed.2d 892 (1988). In Shaw, the first trial ended in a mistrial when it became apparent that the main prosecution witness would refuse to testify. The key witness in Shaw, on the day before trial, advised the judge that she would invoke her privilege against self-incrimination. The trial began before the prosecution was able to obtain immunity for the witness. On the second day of trial, immunity was approved and the judge entered an order compelling the witness to testify. Id. at 719. However, the witness still refused to testify, and the prosecutor moved for a mistrial. The judge granted the motion over defense objection. The Ninth Circuit found that the judge exercised sound discretion in granting the mistrial on the grounds of manifest necessity because the possible bias to the government's case created by defense counsel's adverse references to the witness during opening statements could not be effectively rectified. Id. at 720. Also, and more pertinent to our case, the Ninth Circuit noted that there was "no evidence of undue delay or negligence in the government's failure to obtain immunity for [the witness] before trial. The prosecutor acted to obtain immunity for [the witness] as soon as he learned that she would refuse to testify." Ibid. Double jeopardy doctrine did not bar a retrial.
In United States v. Khait, 643 F. Supp. 605 (S.D.N.Y. 1986), another similar case, the District Court held that reprosecution was not barred where a mistrial was declared as a result of an essential witness's refusal to testify because of death threats, even *373 though the government knew before the jury was sworn that the witness probably would not testify. In Khait, the government's key witness informed the judge on the day that jury selection began that his wife had received death threats and that he would refuse to testify if called. The next day the government said that it would seek a civil contempt order against the witness if he refused to testify. The jury was then sworn, and upon the witness's continued refusal to testify, the judge found him in contempt and ordered him incarcerated. The trial was adjourned for three weeks. When the trial reconvened, the witness continued his refusal to testify and the judge released him, reasoning that any further incarceration would not serve a coercive purpose. The government requested and obtained a mistrial. The defendant then moved for dismissal of the indictment on double jeopardy grounds, claiming that no manifest necessity existed because the government knew its main witness would not be available and yet willingly proceeded to participate by the empanelment of a jury.
The District Court rejected the defendant's contention, noting that the "unavailability of the witness in this case ... may not be attributed to prosecutorial misconduct or sloppiness." Id. at 608. The court also concluded that there was a "distinct possibility" that the defendant participated in making the witness unavailable. Id. at 609. Although there was no formally adduced evidence linking defendant to the alleged threats to the witness's family, those threats were "virtually identical" to some of the charges alleged in the indictment against defendant, and the defendant was the only one who would benefit from making such threats. Further, the judge recognized that a failure to find manifest necessity for mistrial under these facts would lead to a "catch-22" situation for the government: "the government has to have a jury sworn before it can have a recalcitrant witness held in civil contempt; yet in having the jury sworn jeopardy attaches." Id. at 609-10; see United States v. Johnson, 736 F.2d 358, 360 (6th Cir.1984).
*374 In Johnson, the Sixth Circuit addressed the nettlesome issue of whether a trial judge may hold a witness in civil contempt before the trial starts because the witness states an intention not to testify in the future at trial. Ibid. The judge concluded that, under the federal contempt statute, 28 U.S.C.A. § 1826, which requires the refusal to comply with a court order to take place in a "proceeding before or ancillary to any court or grand jury," a judge may impose a contempt sanction only at trial and after an actual refusal to testify. 736 F.2d at 363. Thus, a witness's indication before trial that he will not testify when called to the stand could not justify an "anticipatory" contempt citation.
The Sixth Circuit reasoned that even if such a witness could be held in contempt and such an order convinced the witness to testify, there would be no guarantee that, once put on the stand before the jury, the witness would not change his mind again. The Court of Appeals recognized the government's concern that by waiting until after commencement of trial to obtain a contempt judgment against a witness who has already indicated an unwillingness to testify, the government runs the risk of being barred from further prosecution by double jeopardy. However, the court reasoned that the issue really comes down to whether the witness has the resolve to resist testifying and that this risk is not decreased by the use of an anticipatory contempt order. If the government can not make its case without the witness's testimony, "then the government will be unable to prosecute the [defendants] regardless of any double jeopardy concerns." Ibid. As noted in United States v. Khait, supra, 643 F. Supp. at 609-10, however, an appropriate response to such a situation probably is a continuance, followed by a mistrial.
In applying the various factors and concerns expressed in this collection of analogous cases to the situation before us we cannot say that the State's conduct here was improper in any serious or fatal respect. We think that the judge exercised sound discretion in first granting the many adjournments and then finally declaring the mistrial. We also conclude that, for purposes of double *375 jeopardy analysis, the adjournments allowed by the judge and the subsequent declaration of mistrial were "required by sufficient legal reason and manifest or absolute or overriding necessity." N.J.S.A. 2C:1-9.
The State's actions throughout the history of this case do not reveal any overt neglect or bad faith. At the original trial in 1989, at which defendant was convicted, Elliott refused to testify against the defendant. She actually testified on his behalf. The State, rather than relying on a grant of immunity and an order to compel testimony, introduced the statement she gave to police after the incident through the testimony of Officer Gaimari. This produced the 1991 reversal. Thus, at the second trial, the State realized that Elliott would have to testify if the case was to proceed. On the day before the January 1992 jury was sworn, when Elliott said that she would not testify and that she was asserting her privilege against self-incrimination, the State promptly expressed the intent to obtain a grant of immunity so that Elliott could be compelled to testify.
Defendant makes much of the fact that the State did not obtain immunity for Elliott until the second day of trial. However, the fact that the State began the trial prior to obtaining the immunity, rather than requesting a postponement, was a reasonable decision, see United States v. Shaw, supra, 829 F.2d at 720, and, in any event, most likely did not affect the eventual progression of events and the outcome of the retrial. Had the State done what defendant suggests and obtained the grant of immunity prior to commencement of trial, there still was no absolute guarantee that Elliott either would or would not testify. The State had to go forward with the trial because (1) there is always the possibility that a reluctant witness will change her mind; and (2) if Elliott's resolve remained strong, the State could not seek to have Elliott held in civil contempt until after she was called before a jury and refused to testify. See United States v. Khait, supra, 643 F. Supp. at 609-10. Under our statute N.J.S.A. 2A:81-17.3, a witness may be held in contempt and incarcerated for refusing to testify "in *376 any criminal proceeding before a court or grand jury," after receiving a grant of immunity. Thus, even though the State was aware of Elliott's recalcitrance, the State could probably only attempt to compel her to testify before a jury by threat of incarceration after jeopardy had attached, whether or not immunity actually was obtained before the trial began. Moreover, the decision to go forward with the trial did not cause any actual detriment to defendant. The normal process of the trial was not disrupted or delayed while the State pursued the necessary procedures to obtain Elliott's immunity.
We find this case quite distinguishable from such cases as Downum and Stani, where the "unavailability" of a prosecution witness was at least in some part due to the prosecutor's neglect or lack of preparation. See United States v. Shaw, supra, 829 F.2d at 720; United States ex rel. Gibson v. Ziegele, supra, 479 F.2d at 775; United States v. Khait, supra, 643 F. Supp. 605-06. Here, the State ensured Elliott's actual physical presence at trial but could do no more than it did in attempting to compel her to speak. Also, the delays created by the numerous adjournments and now by the mistrial were not designed to provide the State with the opportunity to strengthen its case. Apparently, the State had no real case without Elliott. The State requested the delays for the sole purpose of compelling Elliott to testify. We find it unreasonable to suggest that the State acted as it did, making repeated requests for adjournments, to foster a mistrial, even though all involved must have realized that a mistrial was inevitable because of the lengthy delay. See State v. Farmer, 48 N.J. at 175, 224 A.2d 481. Indeed, the State wished to prolong the proceedings as long as possible, not in order to further investigate the case or harass defendant, but simply because they needed Elliott's testimony.
When Elliott refused to testify despite the grant of immunity, the judge could have dismissed the case, declared a mistrial, see United States v. Shaw, supra, 829 F.2d at 718, or done as he did and hold Elliott in contempt, order her incarceration and temporarily *377 adjourn the trial. See United States v. Khait, supra, 643 F. Supp. at 606. As our Supreme Court has pointed out, "one of the alternatives given to courts in order to avoid unnecessary termination of proceedings is to take advantage of the opportunity to adjourn cases." State v. Gallegan, supra, 117 N.J. at 353, 567 A.2d 204. Here, when the State's witness made herself "unavailable" by refusing to testify, the judge held her in contempt. Rather than ask for a mistrial, the State requested an adjournment with the hope that, after some time in jail, she would reconsider and testify. Clearly, the judge did not abuse his discretion by choosing an alternative that was designed to provide the State an opportunity to present its case while not depriving defendant of his valued right to proceed before this particular tribunal.
When the judge finally declared a mistrial after nearly three months, such action was necessitated by the decrease in the number of jurors from fourteen to nine, because of the inevitable hardship created by their continued participation. The three-month "delay" was necessitated by the judge's appropriate attempt to compel Elliott to testify, not by the State's recalcitrance. This was not a case where there were other, more practical and obvious, alternatives to the procedure complained of or where the additional time was intended to provide the prosecutor with the opportunity to bolster the State's case, or where the manifest necessity for mistrial was the result of prosecutorial neglect or sloppiness. In this case, the State did not "retreat from the field when its case turn[ed] sour," and it was not seeking the opportunity to go before a new jury with its case "refreshed and reinforced." See State v. Gallegan, supra, 117 N.J. at 346, 567 A.2d 204, citing State v. Stani, supra, 197 N.J. Super. at 151, 484 A.2d 341.
Although the State's effort was in good faith, the situation does raise the question of how long a defendant can be kept in jeopardy before fundamental fairness requires the State to surrender the effort to prosecute. Our Supreme Court has "always *378 recognized the interaction between double jeopardy and fundamental fairness." State v. Gallegan, supra, 117 N.J. at 355, 567 A.2d 204. Also, although not specifically urged by defendant, we may consider whether the issues of speedy trial and fundamental fairness should bar further prosecution of Dunns. In bringing an accused to trial, "the methods employed by the State must measure up to commonly accepted standards of decency of conduct to which government must adhere." Id. at 356, 567 A.2d 204, quoting State v. Talbot, 71 N.J. 160, 168, 364 A.2d 9 (1976). Further, "[i]nterests of substantial justice ... do not permit endless adjournments and delays in trials of cases of the significance of [a] DWI/assault case." State v. Gallegan, supra, 117 N.J. at 355, 567 A.2d 204.
"The anxiety, vexation, embarrassment, and expense to the defendant of continual reprosecution where no new evidence exists is a proper subject for the application of traditional notions of fundamental fairness and substantial justice." State v. Abatti, supra, 99 N.J. at 430, 493 A.2d 513. In Abatti, our Court held that, although not required on double jeopardy grounds, a judge may dismiss a criminal indictment with prejudice on grounds of fundamental fairness and due process where a defendant has been tried twice and both times the jury failed to agree, and where the judge determines that the State's chance of obtaining a conviction on retrial is highly unlikely. Id. at 435, 493 A.2d 513. The Court stated that, in addition to balancing the rights of the individual defendant against the public's concern for the effective and definitive conclusion of criminal prosecutions, a judge must carefully consider certain specific factors, one of which is "the likelihood of any substantial difference in a subsequent trial, if allowed." Ibid.
The principle announced in Abatti is apt in the present case. We conclude it very likely that Elliott would again refuse to cooperate if the State again tries to compel her to testify. If this happens, defendant who now has been subjected to two trials, one reversed on appeal because of improper evidence used by the State and the other ending in a mistrial after three months of *379 interim adjournments, and who has served 20 months in prison, would, we think, have suffered an inordinate amount of prejudice and unfairness. Although there has not yet been a complete, error-free trial on the merits, we think that another attempt by the State to try defendant will result in nothing but further harassment and expense imposed on him with very little likelihood of success for the State or vindication of the integrity of the criminal justice system.
In terms of the right to speedy trial, "a delay in completing a prosecution may, depending on the circumstances, violate a defendant's constitutional right to speedy trial." State v. Gallegan, supra, 117 N.J. at 355, 567 A.2d 204, citing Pollard v. United States, 352 U.S. 354, 361, 77 S.Ct. 481, 485, 1 L.Ed.2d 393, 399 (1957). In determining whether a defendant's right to speedy trial has been violated, a court should balance factors such as the length of the delay, the reasons for the delay, defendant's assertion of his right to a speedy trial, and any prejudice to defendant caused by the delay. State v. Gallegan, supra, 117 N.J. at 355, 567 A.2d 204, citing Barker v. Wingo, 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101, 117 (1972). Where a defendant has been denied a speedy trial, dismissal is the only adequate remedy. Strunk v. United States, 412 U.S. 434, 440, 93 S.Ct. 2260, 2263, 37 L.Ed.2d 56, 61 (1973).
In this case, defendant repeatedly asserted his right to a speedy trial, continuously asking the judge to require the State to go forward with its case. During the three-month delay, defendant also asserted his right to be free from double jeopardy. On the other hand, there was a significant reason for the delay, i.e., the court's attempt to compel an essential witness to testify. As in State v. Gallegan, supra, 117 N.J. at 357, 567 A.2d 204, the prosecutor was prepared for trial; the delay was not caused by prosecutorial neglect or misconduct.
Counter to defendant's right to have his trial completed before a particular tribunal and also counter to the interest in protecting defendant from continued exposure to anxiety, embarrassment, *380 and expense, we must balance the public interest in insuring that the State has one full opportunity to present its case and that both sides receive a fundamentally fair trial.
Clearly the societal right to have the accused tried and punished if found guilty stands side by side with the right of the accused to be prosecuted fairly and not oppressively. While the public right, when it must be considered alone, may not weigh as heavily in the scale as that of the defendant because of the constitutional dimensions of the privilege against double jeopardy and the superior capacity of the State to investigate and prepare for prosecutions, nevertheless when exercise of the trial court's discretion may fairly be said to serve both interests, there is certainly less substantial reason to question its propriety. [State v. Farmer, supra, 48 N.J. at 175, 224 A.2d 481.]
However, where there is doubt as to whether retrial is justified, such doubt must be resolved in favor of the liberty of the citizen. Downum v. United States, supra, 372 U.S. at 738, 83 S.Ct. at 1035, 10 L.Ed.2d at 104; United States ex rel Russo v. Superior Court of New Jersey, supra, 483 F.2d at 17.
Here, the State had three months to muster and present its case in early 1992. The State also had a year between the first and second trials to attempt to garner some other hard evidence against Dunns. Although clearly not the State's fault that Elliott refused to testify, the "unavailability" of evidence can justify the continued exposure of defendant to anxiety and expense for only so long. Not all prosecutions turn out perfectly. Sometimes the essential piece of evidence remains just beyond the State's grasp, and in the end, there is nothing the State can do about it. Because of Elliott's steadfast resolve after three months in jail and a trip to the psychiatric ward, we find it very unlikely that she would agree to testify at a third trial. To force Dunns to go through another possibly lengthy "trial," adding to his expense, impacting on his livelihood and personal relations, and even his physical and emotional well-being, seems fundamentally unfair. The presumption of innocence still applies. The State can not expect to receive endless adjournments and retrials based on the slim hope that the defendant's "girlfriend" will someday testify *381 against him.[4]
We conclude that this case is very similar to State v. Abatti, supra, 99 N.J. at 435, 493 A.2d 513; both involve circumstances which, under technical double jeopardy doctrine, would not prevent retrial. The mistrial here was "manifestly necessary," as that term has been defined in the evolving case law. However, looking at the overall picture, i.e., the likelihood of success, the prejudicial impact on defendant, and other concerns, dismissal of the indictment is well justified. We hold that further pursuit of this matter to a third trial would offend principles of fundamental fairness and not serve the ends of public justice. Upon considering all relevant factors including the gravity of the remaining criminal charges, the public's concern about definitive conclusion of prosecutions, and the impact on defendant in terms of hardship and unfairness, we conclude that the indictment must be dismissed.
We reverse and order dismissal of the indictment.
NOTES
[1] We set forth the factual background of the events leading to defendant's indictment in our unpublished opinion of January 30, 1991 when we reversed the 1989 convictions:

According to Officer Gaimari's testimony at trial, defendant, a former Trenton State Prison corrections officer, had an argument with his girlfriend, Lynn Elliott. They went for a drive in defendant's car and continued to argue until defendant pulled to the side of the road and parked. Defendant got out of the car, opened the trunk and took out a gun. Ms. Elliott got out to run but instead stood still. Defendant pointed the gun at her and fired a shot. She ducked but then noticed her head was bleeding and she pleaded with defendant to take her to the hospital. Defendant told her that he was just trying to scare her and did not mean for the bullet to hit her. He told her to say that she hit her head on the car.
At the hospital, when Ms. Elliott first spoke to Officer Gaimari, she told him she slipped and fell along side of her boyfriend's vehicle, but the officer felt she was not telling the truth. She then stated she could not tell him what really happened because defendant would lose his job and kill her.
Officer Gaimari left the hospital and returned approximately one-half hour later in response to a complaint that defendant was wrestling in the hospital hallway with members of Ms. Elliott's family. Defendant was escorted out of the hospital. The officer again spoke with Ms. Elliott, who stated she would now tell him the truth. She then gave him the above account of the incident, which Officer Gaimari testified to at trial as part of the State's case.
Ms. Elliott testified for the defense that they pulled over to the side of the road so that she could relieve herself. While she was doing so by the front tire, she heard a loud boom, at which time she hit her head on the car fender, causing a metal barrette in her hair to cut her scalp. She stated that she made up the story to Officer Gaimari that defendant shot her because she believed he was going to leave her and she wanted to get revenge.
Defendant testified that he fired the gun up into the air to relieve tension.
[2] N.J.S.A. 2A:81-17.3 states:

In any criminal proceeding before a court or grand jury, if a person refuses to answer a question or produce evidence of any other kind on the ground that he may be incriminated thereby and if the Attorney General or the county prosecutor with the approval of the Attorney General, in writing, requests the court to order that person to answer the question or produce the evidence, the court shall so order and that person shall comply with the order. After complying and if but for this section, he would have been privileged to withhold the answer given or the evidence produced by him, such testimony or evidence, or any information directly or indirectly derived from such testimony or evidence, may not be used against the person in any proceeding or prosecution for a crime or offense concerning which he gave answer or produced evidence under court order. However, he may nevertheless be prosecuted or subjected to penalty or forfeiture for any perjury, false swearing or contempt committed in an answering, or failing to answer, or in producing, or failing to produce, evidence in accordance with the order. If a person refuses after being ordered to testify as aforesaid, he may be adjudged in contempt and committed to the county jail until such time as he purges himself of contempt by testifying as ordered without regard to the expiration of the grand jury; provided, however, that if the grand jury before which he was ordered to testify has been dissolved, he may then purge himself by testifying before the court.
[3] According to the State's representation at oral argument the defendant was not charged with possessing the firearm illegally because the exemption in N.J.S.A. 2C:39-6(a)(5) for correction officers presumably applied.
[4] Our new rules of evidence adopted effective July 1, 1993 now define "unavailability" of a witness for purposes of use of testimony in prior proceedings to include "if declarant: ... (2) persists in refusing to testify concerning the subject matter of the [prior] statement despite an order of the court to do so;..." N.J.E.R. 804(a)(2). This change in the rules of evidence does not alter the fundamental fairness analysis.