794 A.2d 165

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. LUIS A. CRUZ, JR., DEFENDANT–APPELLANT.

Argued January 14, 2002—Decided April 9, 2002.

420

*Fred B. Last*, Assistant Public Defender, argued the cause for appellant (*Peter A. Garcia*, Acting Public Defender, attorney; *Mr. Last* and *Jorge C. Godoy*, Deputy Public Defender, of counsel).

*Keith M. Warburton*, First Assistant Prosecutor, argued the cause for respondent (*Andrew N. Yurick, II*, Gloucester County Prosecutor, attorney).

*Robert E. Bonpietro*, Deputy Attorney General, argued the cause for *amicus curiae*, Attorney General of New Jersey (*John J. Farmer, Jr.*, Attorney General, attorney).

The opinion of the Court was delivered by

STEIN, J.

In this capital murder prosecution that was tried to a jury from January 17 to March 6, 2001, the trial court declared a mistrial because the jury was unable to reach a unanimous verdict on any count. After the Law Division denied defendant's post-trial motion to dismiss the capital murder count, we granted defendant's motion for leave to appeal that denial. Accordingly, the critical issue before us is whether principles of double jeopardy or fundamental fairness preclude retrial of a charge of capital murder if the first trial jury is unable to reach a unanimous verdict on the murder count.

Relying on our decisional law that establishes that a non-unanimous jury verdict on the issue whether defendant committed the murder in question by his own conduct precludes the death penalty, defendant asserts that a non-unanimous verdict on the murder count must necessarily be regarded as a non-unanimous verdict on the "by your own conduct" issue. We reject that contention and affirm the ruling of the Law Division.

I

In an earlier appeal involving this capital murder prosecution, this Court granted the Attorney General's motion for leave to appeal the Appellate Division's determination concerning the appropriate jury instruction for serious bodily injury (SBI) capital murder, and discharged the unsworn sixteen-member petit jury that previously had been selected. *State v. Cruz*, 163 *N.J.* 403, 408–09, 749 *A*.2d 832 (2000). In our prior opinion, we set forth the factual background pertinent to the issue on appeal:

> On December 11, 1995, seventy-four-year old Santina Leonardi, the owner of a combination convenience store and home in Woolwich Township, was found dead on the floor of the store by her granddaughter. Mrs. Leonardi had been beaten about the head and face and stabbed fourteen times. A broken knife blade was embedded in Mrs. Leonardi's chest. Thirteen of the fourteen stab wounds penetrated the heart and major blood vessels surrounding the heart. The other wound was a defensive wound to her hand. Mrs. Leonardi was pronounced dead at the scene.

The Gloucester County Prosecutor's homicide investigation eventually focused on defendant Luis A. Cruz, Jr. On February 24, 1996 co-defendant Jorge Pinto–Rivera agreed to wear a body wire and thereafter had several conversations with defendant. The statements made by defendant during those conversations were insufficient, however, to support the issuance of an arrest warrant. Subsequently, on February 26, 1996, Pinto–Rivera had a telephone conversation with defendant that was monitored. During the conversation Pinto–Rivera asked defendant the name of the woman that he had murdered and defendant responded with the name of the decedent, Mrs. Leonardi. Defendant also said that he was alone when he committed the murder. Based on that evidence, defendant was arrested and charged with the murder of Mrs. Leonardi.

During his post-arrest interrogation, defendant made a taped statement confessing to Mrs. Leonardi's murder. He said that an unspecified person had threatened to shoot him if he did not steal the deed to her house from Mrs. Leonardi. Defendant said that he and Pinto–Rivera went to the victim's convenience store after it was closed to rob her of the deed, and that during the robbery Pinto Rivera knocked Mrs. Leonardi to the floor. Defendant said he stabbed her because she knew him and could identify him. However, he claimed that he stabbed Mrs. Leonardi only twice, and that after he left the store co-defendant Pinto–Rivera reentered the store alone and remained there for a short time before the two left the area. Defendant now denies any involvement in the robbery or the murder. Co-defendant Pinto–Rivera was arrested and pled guilty to armed robbery and other offenses.

A Gloucester County Grand Jury returned an indictment charging defendant with capital murder and other related offenses. [The other offenses were felony murder, robbery, conspiracy to commit robbery, possession of a weapon for an unlawful purpose, and unlawful possession of a weapon.] The County Prosecutor chose to prosecute defendant capitally and filed a Notice of Aggravating Factors alleging that the murder was committed for the purpose of escaping detection, *N.J.S.A.* 2C:11–3c(4)(f), and that the murder was committed while defendant was engaged in the commission of a robbery, *N.J.S.A.* 2C:11–3c(4)(g).

[*Id.* at 405–07, 749 *A.*2d 832.]

After this Court's resolution of the jury instruction issue, a second jury was selected and defendant's trial commenced on January 17, 2001. Although the trial court's jury instructions are not in the record, the verdict sheet indicates that the court charged the jury on the lesser-included offenses of aggravated manslaughter, reckless manslaughter, and aggravated assault. On Thursday, March 2, 2001, at about 4:00 p.m., the jury sent a note to the trial court that stated: "We are unable to come to a unanimous agreement on any charges. Where do we go from here?" The trial court instructed the jury consistent with *State v. Czachor,* 82 *N.J.* 392, 405 n. 4, 413 *A.*2d 593 (1980), and requested

that the jury return the following Monday to resume its deliberations. The jury complied, but at 12:15 p.m. on Monday it sent the trial court another note that stated: "After further deliberation, we are unable to come to a unanimous decision on any counts set before us." After declaring a mistrial and discharging the jury, the trial court conferred with the forewoman concerning the jurors' votes on the various counts:

The Court: Do you remember on the first charge what?

Juror No. 1: No one felt that he would have been—was guilty of murder.

The Court: No one felt he was guilty of murder?

Juror No. 1: On that charge, number 1.

The Court: So you never got to (a) or (b) [the 'own conduct' inquiry]?

Juror No. 1: Correct.

The Court: That brought you to 2?

Juror No. 1: Yes.

The Court: And you do remember the votes there?

Juror No. 1: Between 2, 3, and 4 they were mixed. It was one, two—do you want me to get the notes?

The Court: Do you mind? I'd appreciate that a whole lot. We'll wait for you.
. . . .

Juror No. 1: With our discussion today, no one felt that they could be sure that he was actually guilty of murder. So our pending discussion was that he would be not guilty on that because there wasn't enough evidence presented.

The Court: So where did that break you down on 2, 3, and 4, if you remember [referring to aggravated manslaughter, reckless manslaughter, and aggravated assault]?

Juror No. 1: Most people went with number 4, aggravated assault, majority.

The Court: And how about number 5, felony murder?

Juror No. 1: We had, actually, 9 felt that he would have been guilty of felony murder.

The Court: Nine?

Juror No. 1: Nine, if we could have agreed that he was there for the robbery. And, for the most part, the majority were leaning towards his guilt of some sort. We felt that he was present, that there was some conspiracy, but not everyone felt that way. Just felt that there was just not enough compelling evidence to tell him that he was there.

Based on the forewoman's comments, defense counsel moved to recall the jury and have the court enter a not guilty verdict on the capital murder count. The court reserved decision on the motion.

Two days later, the court recalled the forewoman to clarify the votes on the murder count, explaining that her prior statement that there were *no* votes for a murder conviction was inconsistent with the note stating that the jury could not agree unanimously on any count. The following colloquy ensued:

The Court: Where it says on the charge of murder our verdict is not guilty of murder, our verdict is guilty of murder, you had mentioned some discussion among the jurors about there being no votes, and for something like that. Can you refresh my recollection, or did I misunderstand you?

Juror No. 1: We voted on that and we did not get, obviously, unanimous.

The Court: Do you remember what, when you say not unanimous, was it like 10 to 2, 11 to 1, like 8 people voting for not guilty, 4 people saying, well, I haven't made up my mind? I'm not trying to put words in your mouth. I'm trying to get a description.

Juror No. 1: We had approximately 4 guilty, a few for not guilty, and maybe 3 that hadn't made up their mind.

The Court: And that's your best recollection?

Juror No. 1: Yes.

. . . .

The Court: Why I got confused and asked you to come back was because you had seemed to indicate that, at least the way I understood it, and maybe that's not the way it was communicated, cause even lawyers and judges misunderstand stuff all the time, that you seem to say that there were no votes for guilty on murder. Was that a misinterpretation of the question or as you understood it or what?

Juror No. 1: Misinterpretation of the question possibly. There were some votes for guilty.

The Court: There were some votes for guilty.

Okay. I'm glad I called you back. You remember how many?

Juror No. 1: Approximately 3.

The Court: 3. And do you remember whether everybody else was for not guilty or whether a couple people were undecided? I know sometimes in jury rooms people go I'm not ready to vote or whatever.

Juror No. 1: There were 3 that said not guilty because they felt the evidence just wasn't there.

The Court: Okay.

Juror No. 1: And the rest would have gone with not guilty, also, and possibly gone for a lesser charge.

The Court: That was sort of a trade-off?

Juror No. 1: Yes.

The Court: In other words, they were still thinking about it?

Juror No. 1: Most of the people felt he was present, but just didn't think there was enough evidence to substantiate his participation.

The Court: I'm not going to ask you anything more about your deliberations. I thank you so much.

That exchange constitutes the basis for defendant's assertion that the discharged jury had voted 9–3 for acquittal on the murder charge. The court's colloquy with the forewoman also established that the jury never reached the "own conduct" issue on the verdict sheet.

The following day, the court denied defense counsel's motion for entry of a not guilty verdict on the capital murder count. Defendant then moved before the Criminal Presiding Judge to dismiss the capital murder count or bar retrial as a capital case. That motion also was denied, and the Appellate Division denied leave to appeal. We granted leave to appeal as well as the Attorney General's motion to appear as *amicus curiae.*

## I

### A. *Double Jeopardy*

Although there are language differences in the double jeopardy provisions of the federal and state constitutions, our Court consistently has interpreted those provisions harmoniously. *See State v. Loyal,* 164 *N.J.* 418, 437, 753 *A.*2d 1073 (2000); *State v. Widmaier,* 157 *N.J.* 475, 500, 724 *A.*2d 241 (1999); *State v. Koedatich,* 118 *N.J.* 513, 518, 572 *A.*2d 622 (1990); *State v. Rechtschaffer,* 70 *N.J.* 395, 404, 360 *A.*2d 362 (1976). Accordingly, both federal and state precedents are relevant to the issue before us.

The United States Supreme Court consistently has held that a jury's inability to reach a verdict in a criminal prosecution results in a "manifest necessity" for the trial court to declare a mistrial, and that reprosecution for the same offense does not violate the Fifth Amendment's double jeopardy clause. *United States v. Perez,* 22 *U.S.* (9 *Wheat.*) 579, 580, 6 *L.Ed.* 165 (1824); *see also Oregon v. Kennedy,* 456 *U.S.* 667, 671–72, 102 *S.Ct.* 2083, 2087, 72 *L.Ed.*2d 416, 422 (1982) (citing *Perez* with approval, and noting

that double jeopardy clause "does not offer a guarantee to the defendant that the State will vindicate its societal interest in the enforcement of the criminal laws in one proceeding."); *Wade v. Hunter,* 336 *U.S.* 684, 689, 69 *S.Ct.* 834, 837, 93 *L.Ed.* 974, 978 (1949) (noting that retrial following jury's failure to agree on verdict is "not the type of oppressive practice[ ] at which the double-jeopardy prohibition is aimed"); *Logan v. United States,* 144 *U.S.* 263, 297–98, 12 *S.Ct.* 617, 627–28, 36 *L.Ed.* 429, 441 (1892) (citing *Perez* with approval).

Our Court also has interpreted our state constitutional bar of double jeopardy as being "no less clear in allowing retrial after a mistrial due to a deadlocked jury." *State v. Abbati,* 99 *N.J.* 418, 427, 493 *A.*2d 513 (1985); *see State v. Romeo,* 43 *N.J.* 188, 195, 203 *A.*2d 23 (1964); *State v. Williams,* 30 *N.J.* 105, 120–21, 152 *A.*2d 9 (1959); *City of Newark v. Pulverman,* 12 *N.J.* 105, 110, 95 *A.*2d 889 (1953). As the Appellate Division observed in *State v. Hale,* 127 *N.J.Super.* 407, 412, 317 *A.*2d 731 (1974), a mistrial caused by a jury deadlock "is not a judgment or order in favor of any of the parties" and "lacks the finality of a judgment, and means that the trial itself was a nullity."

Although defendant concedes that double jeopardy principles do not preclude his retrial on the murder charge, he contends that the jury's 9–3 vote for acquittal on the murder charge logically can be interpreted as a non-unanimous determination that defendant did not commit the charged murder "by his own conduct." That contention requires our consideration of the significance of the statutory condition in *N.J.S.A.* 2C:11–3c that, except for homicides solicited by an accomplice for pecuniary value, or commanded or solicited by a leader of a narcotics trafficking network, limits eligibility for the death penalty only to a defendant who "committed the homicidal act by his own conduct."

In *State v. Gerald,* 113 *N.J.* 40, 549 *A.*2d 792 (1988), this Court traced the legislative history of the requirement in the death penalty statute that the defendant commit the homicidal act 'by his own conduct.' *Id.* at 92–96, 549 *A.*2d 792. We concluded

that the Legislature's adoption of the "own conduct" requirement "reinstated for purposes of capital punishment the distinction between principal and accomplice. While the imputation of liability for the conduct of another suffices for a murder conviction, the defendant's "own conduct" in the commission of the murder is a prerequisite to imposition of the death penalty." *Id.* at 96, 549 *A*.2d 792.

We explained in *Gerald* that the own conduct requirement is "'not an element of the offense of murder. It is merely a triggering device for the death penalty phase of the trial.'" 113 *N.J.* at 99, 549 *A*.2d 792 (quoting *State v. Moore,* 207 *N.J.Super.* 561, 576, 504 *A*.2d 804 (Law Div.1985)). We further observed that

the elements of the crimes of purposeful and knowing murder, as set forth in *N.J.S.A.* 2C:11–3(a), do *not* require "that the defendant must have committed the homicidal act by his own conduct before he can be convicted of murder. The factual determination that the defendant committed the murder by his own conduct only becomes important after the defendant is found guilty of murder."

[*Ibid.*]

We went on to explain in *Gerald* the substantial distinction between the "own conduct" determination and the jury's decision to convict a defendant of purposeful or knowing murder:

We agree with Judge Newman's analysis in *Moore.* The requirement that the homicidal act be committed by the defendant's own conduct is simply irrelevant to the question of whether defendant is guilty of purposeful or knowing murder. During guilt-phase proceedings, the jury first must determine whether defendant should be convicted of murder, considering, where appropriate, principles of vicarious liability under *N.J.S.A.* 2C:2–6. *Only after it has unanimously found defendant guilty of purposeful and knowing murder should the jury turn to the question of whether defendant committed the homicidal act by his or her own conduct.* . . . Only those murderers whose conviction rests on their status as principals—those who have committed the homicidal act by their own conduct—or on the fact that they have hired another to commit the crime may face the death penalty.

[*Id.* at 100, 549 *A*.2d 792 (emphasis added).]

In *State v. Brown,* 138 *N.J.* 481, 511, 651 *A*.2d 19 (1994), we supplemented our observations in *Gerald* concerning the "own conduct" requirement with the holding that "inherent in the requirement that the State prove the own-conduct criterion beyond a reasonable doubt is the reciprocal requirement that a jury

unanimously agree that the State has met that burden." *Ibid.* We also held expressly in *Brown* that "the inability of the jury to reach a unanimous decision on the own-conduct determination constitutes a final verdict that results in the imposition of a sentence of imprisonment of at least a thirty-year mandatory term, pursuant to *N.J.S.A.* 2C:11–3b." *Ibid.* Accordingly, we concluded in *Brown* that

> the proper approach is for trial courts to inform juries in capital cases of their option to return a non-unanimous verdict on whether the defendant committed the murder by his own conduct. Similar to the mandated procedure in the penalty phase of the death-penalty process, the significance of the own-conduct determination in triggering the penalty phase supports the conclusion that jurors must be instructed on the nonunanimity option.
>
> [*Id.* at 518, 651 *A.*2d 19.]

*State v. Feaster,* 156 *N.J.* 1, 716 *A.*2d 395 (1998), was a capital murder prosecution in which the Court addressed the correctness of an instruction in the guilt phase that directed the jury to first deliberate on whether defendant committed the charged homicide by his own conduct and, if unconvinced beyond a reasonable doubt that defendant committed own-conduct murder, to then deliberate on whether defendant committed the charged offenses as an accomplice. We held that the sequential charge was error because "own conduct" murder and murder as an accomplice are alternative forms of murder, noting that because they are mutually exclusive they should be considered simultaneously. *Id.* at 38–40, 716 *A.*2d 395. Although we concluded that the error was harmless in the context of the entire record, we used the occasion to clarify how the jury should be instructed in such cases, observing that deliberations on "own conduct" murder do not begin until a jury has unanimously reached a guilty verdict on the charge of purposeful or knowing murder:

> In capital cases that present a jury question whether a defendant is guilty of death-eligible own-conduct murder or accomplice-liability murder, the trial court, after instructing the jury on the requisite elements of the charged offenses, should instruct the jury first to determine whether the defendant is guilty of purposeful-or-knowing murder. *The jury should be instructed that only if it unanimously reaches a guilty verdict on that offense should it then determine whether the defendant committed the murder "by his own conduct"* or, alternatively, as an accomplice, the charge emphasizing that because those alternatives are mutually

exclusive the jury should consider them simultaneously. During the course of its instructions, the court should make clear to the jury that it need not be unanimous on the own-conduct determination, and it must inform the jury of the legal consequences of its own-conduct finding.

We emphasize that the jury's initial determination of guilt or innocence on the charge of purposeful-or-knowing murder is not intended to resolve whether the defendant acted as principal or accomplice. *Only subsequent to a guilty verdict of purposeful-or-knowing murder will the jury specifically consider what form of murder—accomplice-liability or own-conduct—supports the murder conviction.* Our case law supports that view of the jury's deliberations.

[*Id.* at 42–43, 716 *A.*2d 395 (emphasis added) (citations omitted).]

## B. *Fundamental Fairness*

Defendant also asserts that principles of fundamental fairness require dismissal of the capital murder charge. This Court often has invoked the doctrine of fundamental fairness in criminal cases "when the scope of a particular constitutional protection has not been extended to protect a defendant." *State v. Yoskowitz,* 116 *N.J.* 679, 705, 563 *A.*2d 1 (1989). Thus, even in circumstances not implicating violations of constitutional rights our courts have imposed limitations on governmental actions on grounds of funda-mental fairness. See *State v. Tropea,* 78 *N.J.* 309, 315–16, 394 *A.*2d 355 (1978) (applying principles of fundamental fairness to bar defendant's retrial on motor vehicle speeding charge where rever-sal of earlier conviction was based on State's failure to prove applicable speed limit); *Rodriguez v. Rosenblatt,* 58 *N.J.* 281, 294–96, 277 *A.*2d 216 (1971) (applying principles of fundamental fair-ness and holding that indigent municipal court defendants facing charges entailing "imprisonment ... or other consequence of magnitude" must be afforded right to assigned counsel); *State v. Calvacca,* 199 *N.J.Super.* 434, 440–41, 489 *A.*2d 1199 (App.Div. 1985) (holding that in view of first trial court's reliance on defen-dant's drunkenness to impose custodial sentence for death by auto conviction, principles of fundamental fairness barred second trial court's imposition of custodial sentence based on drunk driving conviction arising out of same event).

We also have applied the fundamental fairness doctrine to criminal prosecutions resulting in mistrial because of jury dead-

lock. In *State v. Abbati*, 99 *N.J.* 418, 427, 493 *A.2d* 513 (1985), this Court acknowledged the judiciary's inherent authority, based in part on principles of fundamental fairness, to dismiss an indictment with prejudice after successive mistrials due to jury deadlock. The trial court, after two mistrials caused by hung juries, dismissed an indictment charging defendant with first-degree kidnapping and aggravated sexual assault. *Id.* at 423–25, 493 *A.2d* 513. A divided panel of the Appellate Division reversed, holding that a trial court's power to dismiss an indictment is exercisable only in the event of a "patent and gross abuse of [prosecutional] discretion...." *State v. Abbati*, 195 *N.J.Super.* 218, 223, 478 *A.2d* 1212 (App.Div.1984). Reversing the Appellate Division and remanding to the trial court to reconsider its ruling based on the standards we articulated, we noted that although principles of double jeopardy may not bar a retrial,

> precepts of fundamental fairness, together with the judiciary's need to create appropriate and just remedies, and its general responsibility to assure the overall efficient administration of the criminal justice system, confirm an inherent power in a trial court to dismiss an indictment with prejudice following general mistrials attributable to repeated jury deadlocks.
>
> [99 *N.J.* at 427, 493 *A.2d* 513.]

We stated that "a trial court may dismiss an indictment with prejudice after successive juries have failed to agree on a verdict when it determines that the chance of the State's obtaining a conviction upon further retrial is highly unlikely." *Id.* at 435, 493 *A.2d* 513. The Court emphasized the significance of the following factors in determining whether an indictment should be dismissed:

> (1) [T]he number of prior mistrials and the outcome of the juries' deliberations, so far as is known; (2) the character of prior trials in terms of length, complexity, and similarity of evidence presented; (3) the likelihood of any substantial difference in a subsequent trial, if allowed; (4) the trial court's own evaluation of the relative strength of each party's case; and (5) the professional conduct and diligence of respective counsel, particularly of the prosecuting attorney.
>
> [*Ibid.*]

We also stressed that the competing interest of the State and defendant warranted careful consideration.

> The court must also give due weight to the prosecutor's decision to reprosecute, assessing the reasons for that decision, such as the gravity of the criminal charges

and the public's concern in the effective and definitive conclusion of criminal prosecutions. Conversely, the court should accord careful consideration to the status of the individual defendant and the impact of a retrial upon the defendant in terms of untoward hardship and unfairness.

[*Ibid.*]

The Appellate Division has applied the *Abbati* holding in analogous circumstances. In *State v. Simmons,* 331 *N.J.Super.* 512, 752 *A.*2d 724 (2000), defendant's 1977 convictions for murder and robbery were reversed eighteen years later by the Third Circuit Court of Appeals, *sub nom. Simmons v. Beyer,* 44 *F.*3d 1160, *cert. denied,* 516 *U.S.* 905, 116 *S.Ct.* 271, 133 *L.Ed.*2d 192 (1995). In 1996 defendant was retried on both charges. He again was convicted of robbery and sentenced to fifteen years imprisonment, a term that he already had served in full. The jury could not agree on the murder charge, resulting in a mistrial and an order for a third trial on murder. That trial took place in 1998, and again resulted in a mistrial because the jury was unable to agree. The trial court then denied the defendant's motion to dismiss the murder indictment. The Appellate Division reversed, concluding that "the likelihood of a conviction following a fair retrial is altogether too remote to warrant yet another prosecution almost a quarter of a century after the crime was committed." *Simmons, supra,* 331 *N.J.Super.* at 523, 752 *A.*2d 724. Relying on the Court's decision in *Abbati,* the Appellate Division observed: "The core of the *Abbati* rationale in our view is that when the prosecution, resorting substantially to the same evidence, fails repeatedly to persuade all members of the jury of defendant's guilt beyond a reasonable doubt, it cannot keep trying the same case again and again." *Id.* at 522, 752 *A.*2d 724.

Similarly, *State v. Dunns,* 266 *N.J.Super.* 349, 629 *A.*2d 922 (App.Div.) *certif. denied,* 134 *N.J.* 567, 636 *A.*2d 524 (1993), involved the State's third attempt to convict defendant on charges of aggravated assault and possession of a weapon for an unlawful purpose. In his 1989 trial defendant was convicted on those charges but acquitted on charges of attempted murder and terroristic threats. The convictions were reversed in 1991 due to trial

error. Defendant's second trial began in January 1992, was adjourned indefinitely when the State's principal witness refused to testify, and ended in a mistrial in April 1992 when the remaining members of the jury were discharged. The State sought retrial and the trial court denied defendant's motion to dismiss the indictment. Relying on *Abbati* and, in part, on principles of fundamental fairness, the Appellate Division concluded that the indictment must be dismissed. The court observed:

> The principle announced in *Abbati* is apt in the present case. We conclude it very likely that Elliott would again refuse to cooperate if the State again tries to compel her to testify. If this happens, defendant who now has been subjected to two trials, one reversed on appeal because of improper evidence used by the State and the other ending in a mistrial after three months of interim adjournments, and who has served 20 months in prison, would, we think, have suffered an inordinate amount of prejudice and unfairness. Although there has not yet been a complete, error-free trial on the merits, we think that another attempt by the State to try defendant will result in nothing but further harassment and expense imposed on him with very little likelihood of success for the State or vindication of the integrity of the criminal justice system.
>
> [266 *N.J.Super.* at 378–79, 629 *A.*2d 922.]

### III

We are fully persuaded that neither principles of double jeopardy nor fundamental fairness bar defendant's retrial for capital murder. Although the hung jury's apparent numerical preference for acquittal on the murder charge arguably might suggest that a capital murder reprosecution is unwise and unlikely to succeed, nothing in our double jeopardy or fundamental fairness jurisprudence prohibits the prosecutor from proceeding in that fashion.

Defendant concedes that both federal and state double jeopardy precedents permit his reprosecution for murder. He contends, however, that although the jury deadlock on the murder count justifies a mistrial and retrial of the murder charge, the jury's division on the murder charge constitutes a non-unanimous and final verdict on whether defendant committed murder by his own conduct. Defendant justifies the distinction he urges between the non-finality of the jury deadlock on murder and the finality of the

very same jury vote with respect to own-conduct murder on the basis of our precedents, such as *Brown, supra,* 138 *N.J.* at 511, 651 *A.2d* 19, that hold that a jury's failure to agree on the "own-conduct" issue constitutes a final verdict resulting in a non-death sentence.

 Defendant's arguments appear to be based on a misperception of this Court's death penalty jurisprudence. As we made crystal clear in *Gerald* and in *Feaster,* a guilt-phase jury in a capital case is not permitted to consider the own-conduct issue until it unanimously has determined that defendant is guilty of purposeful or knowing murder.

> Only after it has unanimously found defendant guilty of purposeful and knowing murder should the jury turn to the question of whether defendant committed the homicidal act by his or her own conduct.
>
> [*Gerald, supra,* 113 *N.J.* at 100, 549 *A.2d* 792.]
>
> The jury should be instructed that only if it unanimously reaches a guilty verdict on that offense should it then determine whether the defendant committed the murder "by his own conduct"
>
> [*Feaster, supra,* 156 *N.J.* at 42, 716 *A.2d* 395.]

That sequential principle reflects our analytical recognition that although those issues are related they are not necessarily interdependent. Put differently, a jury that is deadlocked 10–2 for conviction on a murder charge because of an issue concerning identification might, on retrial, return a unanimous guilty verdict and find no difficulty in concluding that the defendant committed the murder by his own conduct. The point is that the concerns that lead to jury deadlock on a murder charge may or may not generate jury indecision on whether a defendant convicted unanimously of murder committed the homicide by his or her own conduct.

Accordingly, consistent with our capital punishment jurisprudence, we infer no significance whatsoever on the "own conduct" issue from a jury deadlock on the murder charge. The Prosecutor, in the exercise of his discretion, can elect to retry defendant on the murder charge. However, unless on retrial the State obtains a unanimous guilty verdict on the murder charge, the own conduct issue will be moot. That conclusion necessarily follows

from our holding in *Gerald* that the own conduct requirement " 'is not an element of the offense of murder ... [but] is merely a triggering device for the death penalty phase of the trial.' " *Gerald, supra,* 113 *N.J.* at 99, 549 *A.*2d 792 (quoting *State v. Moore,* 207 *N.J.Super.* 561, 576, 504 *A.*2d 804 (Law Div.1985)).

Nor are we persuaded that principles of fundamental fairness should bar defendant's reprosecution for capital murder. As our prior opinion made clear, the jury selected in 1999 was discharged *before* it was sworn to afford this Court the opportunity to clarify and establish the appropriate jury charge for serious bodily injury capital murder. *State v. Cruz, supra,* 163 *N.J.* at 408–09, 749 *A.*2d 832. Accordingly, defendant has been tried to a jury only once on the charge of purposeful or knowing murder, that trial resulting in a mistrial because of jury deadlock. Unlike *Abbati, Simmons,* or *Dunns, supra,* all of which involved two or three prior trials before judicial intervention to dismiss the underlying indictment, defendant seeks dismissal of the capital murder charge based only on a single jury's deadlock on murder, that jury never having been permitted to consider the question whether the homicide was committed by defendant's own conduct or as an accomplice. Although there may be cases in which, because of witness unavailability or similar factors, conviction on retrial after one mistrial resulting from jury deadlock is so unlikely that fundamental fairness could bar reprosecution, this clearly is not such a case. Other than the deadlocked jury's apparent inclination in favor of acquittal on the murder charge, nothing presented to the Court demonstrates that retrial is highly unlikely to result in a conviction. We decline, therefore, to apply the doctrine of fundamental fairness to bar defendant's reprosecution for capital murder solely on the basis of a single mistrial resulting from jury deadlock on the murder count.

## IV

We affirm the Law Division's denial of defendant's post-trial motion to dismiss the capital-murder charge and remand the matter to the Law Division for further proceedings.

*For affirming*—Chief Justice PORITZ and Justices STEIN, COLEMAN, LONG, VERNIERO, LaVECCHIA and ZAZZALI—7.

*Opposed*—None.