# RECORD IMPOUNDED

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-1310-23

STATE OF NEW JERSEY,

    Plaintiff-Appellant,

v.

THOMAS P. CANALES, a/k/a
THOMAS P. CHAPAWESTON,

    Defendant-Respondent.

_____

**APPROVED FOR PUBLICATION**

**March 14, 2025**

**APPELLATE DIVISION**

Submitted January 14, 2025 – Decided March 14, 2025

Before Judges Smith, Chase and Vanek.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 17-02-0143.

Yolanda Ciccone, Middlesex County Prosecutor, attorney for appellant (Nancy A. Hulett, Assistant Prosecutor, of counsel and on the briefs).

Jennifer N. Sellitti, Public Defender, attorney for respondent (Samuel C. Carrigan, Assistant Deputy Public Defender, of counsel and on the brief).

The opinion of the court was delivered by

VANEK, J.A.D.

In a seven-count indictment, defendant Thomas Canales was charged with sexual assault, endangering the welfare of a child, and criminal sexual contact relating to three girls under the age of thirteen (J.R., H.C., L.K-D.) and one adult female (E.J.),[1] in separate incidences occurring over a four-month period. Two successive trials were held on all charges, with the first declared a mistrial based on jury deadlock. The second trial led to a conviction, which we vacated and remanded for retrial based on an evidentiary error. On remand, the trial court dismissed the indictment under the fundamental fairness doctrine articulated in State v. Abbati, 99 N.J. 418 (1985), which the State has appealed.

After our thorough review of the record and application of prevailing law, we reverse and remand, concluding the trial court mistakenly exercised its discretion in dismissing the indictment. Our analysis follows.

I.

We set forth the salient facts and procedural history in our decision reversing defendant's conviction and sentence on direct appeal, State v. Canales, (Canales I), No. A-5846-17 (App. Div. Aug. 20, 2021) (slip op. at 2-17). We recount only the most relevant facts from Canales I informing our disposition.

---

[1] Pursuant to Rule 1:38-3(c)(9) and (12), initials are used to protect the victims' identities.

<u>Defendant's First Trial</u>

The material evidence presented to the jury during the first trial is distilled to the following:

<u>Assault of J.R.</u>

On April 20, 2016, a male in a pickup truck stopped J.R., an eleven-year-old girl, as she walked down her street in North Brunswick. The man asked her for directions. While the man spoke to her, J.R. looked inside the truck and saw the man fondling himself with his private parts exposed. After realizing what she observed, J.R. walked away.

Police interviewed J.R., recording the interview on video, which the State played for the jury. During the interview, J.R. told the police that the man's truck was dark blue, almost black, and described the man as wearing a backwards baseball cap and as "kind of chubby" with "really chubby cheeks, and he had kind of like a beard." J.R. was unable to identify defendant from a photo array presented by the police months later.

At trial, J.R. described the man as "kind of big" and "tan" with "really chubby cheeks" and "a small forehead . . . ." She did not remember the color of the truck the man drove, but she did recall it had "the number 4 x 4 on it." J.R. was not asked to identify her assailant in court.

 A-1310-23

Assault of H.C.

Approximately two months later, seven-year-old H.C. was on the porch of her New Brunswick home playing with her sister when she walked down the porch stairs to retrieve a ball. A black car pulled up in front of H.C.'s house and the man driving the car "said something" to H.C., who looked over and saw the man masturbating. H.C.'s father then emerged from the home and yelled at the driver of the car, and the man drove off.

A New Brunswick police officer responded to the scene and spoke with H.C.'s father, who told the officer the man in the car "tried to get [her] to come to the vehicle." Two days later, H.C.'s father informed a detective that H.C. revealed the man in the car was masturbating. At trial, the responding officer testified that H.C.'s father told him the man was Hispanic and drove a black Honda. H.C.'s father did not identify defendant at trial as the driver of the car who spoke to his daughter.

H.C. testified the man "looked like he was brown. Like dark brown. And he didn't have hair." She was not asked if the driver of the car was in the courtroom.

A-1310-23

## Assault of E.J.

On August 25, 2016, E.J., an Edison resident in her thirties, left the playground near her apartment complex when she realized a man was watching her and her three-year old daughter. Back at the apartment complex, when E.J. went to get something from her car, the same man appeared and asked for directions to Highland Park. When E.J. turned to point in the direction of Highland Park, the man groped and squeezed her buttocks then ran away.

Police eventually connected E.J.'s assault with the other cases and arranged for her to view a photo array. E.J. selected defendant's photo and stated, "[h]e looks familiar, but I'm not one hundred . . . percent sure." At trial, she testified that she was concerned about picking the wrong person, but later saw defendant's picture in the newspaper and realized she had chosen correctly. E.J. identified defendant during trial as the man she saw at the park in Edison who later groped her.

## Incident Involving G.S.

On August 28, 2016, G.S., J.B., and some other friends opened a lemonade stand not far from their homes in Highland Park. G.S. was then thirteen years old and J.B. was ten.

A truck pulled up to the lemonade stand and the driver asked the girls for directions to a gas station, which G.S. provided. The same truck returned to the

lemonade stand and gave one of the girls a dollar but when G.S.'s mother approached the driver, he drove away. He subsequently returned and attempted to give the girls another dollar, but they declined it. As the truck drove away, J.B. wrote down the truck's license plate number on her arm. Later that evening, the parents contacted the police and reported a suspicious man driving a truck in the area.

G.S. testified the truck was "a metallic like grayish," and she was "pretty sure it was Ford." Both G.S. and J.B. testified to their recollection of the man's physical appearance.

<u>Assault of L.K-D.</u>

The same day, at around 8:30 p.m., eleven-year-old L.K-D. went outside her home in Highland Park to retrieve her phone from the family car. When she went to open the car door, she realized a man she did not know was behind her. He asked her for directions. After she answered his question, the man thanked her and tried to shake her hand, before grabbing L.K-D.'s arm and touching her buttocks once or twice. The car door was still open and L.K-D. managed to climb inside. L.K-D. moved to the back of the car while the man poked his head through the doorway of the car and asked L.K-D. her name. The man also told L.K-D. to take off her shirt and touch her stomach. Eventually, the man ran away.

A-1310-23

Police then conducted a videotaped interview of L.K-D., which the State played for the jury. During this interview, L.K-D. said the man was white and appeared to be in his forties with dark, "short and spiky" hair. L.K-D. did not identify defendant from a photo array presented three days later.

At trial, L.K-D. testified she did not remember what the man looked like and stated she "couldn't see very well." L.K-D.'s father testified that on the night of the attack, L.K-D. told him the man who attacked her was white. L.K-D. was not asked to identify her assailant in court.

### Defendant's Arrest, Indictment, and Mistrial

Because the assault of L.K-D. occurred only blocks away from where G.S. and J.B. set up their lemonade stand, the police began investigating whether the two events might be related. The police investigated the license plate number J.B. wrote down on her arm, which yielded defendant's name and address. Two days after the incident, the police drove to defendant's address and observed a charcoal gray pick-up truck bearing the license plate number written down by J.B., along with a black Honda Accord registered to defendant's wife.

Meanwhile, Highland Park police posted a TRAX bulletin[2] to other law enforcement departments about the incident involving L.K-D. to see if a similar incident had occurred elsewhere. A New Brunswick police officer who

---

[2] The record does not define the "TRAX" acronym.

A-1310-23

investigated H.C.'s assault saw the bulletin and thought the cases were connected because they both involved an adult asking children for directions.

This led to the September 1, 2016 recorded forensic interview between police, H.C., and H.C.'s father, where H.C.'s father selected defendant's picture from a photo array, identifying defendant as the driver of the vehicle. During the interview, H.C. stated the man in the car was "fat" and had brown skin. She recounted the man stopped the car and asked her, "[w]here is the gas station[?]," while touching his exposed genitalia. Police arrested defendant that day.

A Middlesex County grand jury returned a seven-count indictment against defendant. Prior to the trial commencing, defendant set forth on the record he would not seek severance of the various charges.

Trial proceeded on all charges in July 2017. In addition to witness testimony, the State presented cell tower data, generated using defendant's cell phone records. The data was presented to the jury in a spreadsheet with measurements of latitude and longitude depicting the cell tower locations. Using this data, the State sought to establish defendant's approximate location by demonstrating that phone calls from defendant's cell phone hit nearby cell towers around the time of the incidents involving J.R., H.C., E.J., and L.K-D.

After the jury failed to reach a unanimous verdict, the trial judge declared a mistrial.

A-1310-23

## Defendant's Second Trial

Defendant was retried over six days from the end of November to the beginning of January, before a different jury and trial judge. J.R., H.C., H.C.'s father, E.J., B.V., L.K-D., L.K-D.'s father, G.S., G.S.'s mother, and J.B., among other witnesses, testified for the State. The State also played police video recordings of the photo array identification procedures utilized with J.R., H.C.'s father, E.J., and L.K-D.

H.C.'s father identified defendant in court as the assailant. On cross-examination, H.C.'s father acknowledged that at the first trial, the judge asked "do you see the person in court[?]," and he responded, "I can't see him." When asked to explain the inconsistent testimony from the first to the second trial, H.C.'s father testified, "I was afraid that day."

The State also presented the cell tower data, this time as a map depicting defendant's relative location during each incident. Firefighters from the East Franklin Fire Department testified that on August 28, 2016, the day of the Highland Park incidents, defendant and two other firefighters traveled in a fire truck to Highland Park's fire station in the morning and back to East Franklin after their training concluded that afternoon.

Notwithstanding the substantial evidence already presented, the State sought to conclude its case by admitting evidence of an uncharged assault

9

against B.V., a college-aged young woman, under N.J.R.E. 404(b). The trial judge held a hearing on the State's motion pursuant to N.J.R.E. 104(c). B.V. testified that on August 26, 2016, a car pulled up alongside her and a male asked her for directions while masturbating. She described the driver as a "heavier-set" white man wearing sunglasses and remembered telling the police the man had a goatee. B.V. testified that she would not be able to identify the man again if she saw him in person. The trial judge permitted B.V. to testify at the second trial, finding her anticipated testimony was relevant and was not unduly prejudicial.

After the State rested, defendant testified, denying the allegations against him. He admitted he was in Edison on the day of E.J.'s assault, but testified he was cutting lawns there. He also admitted he was in Highland Park with other members of the East Franklin Fire Department on August 28, the date of L.K-D.'s assault, and the incident involving G.S. and J.B., recounting:

> [W]hile we were at Highland Park, we responded to two calls. While we were on those two calls, I noticed . . . a couple properties that I wanted to pick up for landscaping, [I] was trying to build my accounts in [the] Highland Park area due to the fact that I had lost a couple of them. And so I went back to Highland Park to try to measure the properties and get some more information on them.

Regarding his return to Highland Park, defendant recalled, "I definitely remember the lemonade stand. I remember pulling up and asking for lemonade

10

when I saw the stand," however, "they didn't have any ready."  Defendant

testified he left the area "between [six] and [seven that evening]" and "went

fishing."

On the fourth day of deliberations, the jury found defendant guilty on all

seven counts and he was sentenced to an aggregate prison term of seventeen and

one-half years.  Defendant appealed his conviction and sentence, arguing the

trial court improperly admitted evidence of the uncharged fifth assault on B.V.

under N.J.R.E. 404(b) for the purpose of proving defendant's identity.  We

rejected the State's argument that the introduction of B.V.'s testimony as other-

crimes evidence was harmless error, stating

> [t]here were inconsistencies between B.V.'s description
> of her assailant and the descriptions provided by the
> victims of the charged assaults, most notably in terms
> of his skin color; in addition, three of the victims of the
> charged assaults did not identify defendant, either
> during the photo array identification procedure or at
> trial.  Defendant's identity as the perpetrator of the four
> charged assaults was the major issue at trial.  We
> therefore conclude the trial judge's error in admitting
> B.V.'s testimony was a clear error of judgment that was
> "clearly capable of producing an unjust result."  State
> v. Sheppard, 437 N.J. Super. 171, 188 (App. Div. 2014)
> (citing R. 2:10-2).
>
> [Canales I, slip op. at 26 (citation reformatted).]

As a result, we vacated defendant's convictions and sentence, remanding for a

new trial.  Ibid.  After the remand, the trial court granted defendant pre-trial

release, on Level III monitoring subject to certain other conditions agreed to by the parties. Defendant had been incarcerated for five years.

Defendant's Motion to Dismiss the Indictment

Defendant moved to dismiss the indictment with prejudice under the doctrine of fundamental fairness set forth in <u>Abbati</u>. A third trial judge, who had not presided over either of the two prior trials, granted defendant's motion in a written decision, finding the <u>Abbati</u> factors favored dismissal. In considering the number of prior mistrials and the outcome of jury deliberations in this case, the trial court found there "has been one declared mistrial with a subsequent polling of the jury demonstrating no single vote margins to convict or acquit . . . . The second trial resulted in a conviction on all counts."

In considering the character of prior trials in terms of length, complexity, and similarity of evidence presented, the trial court found both trials, while not overly complex, were lengthy because they involved the testimony of nearly nineteen witnesses. The trial court found the number of witnesses "along with multiple documents and materials in evidence raise the level of complexity . . . [making] basic allegations . . . much more challenging, difficult, and complicated . . . ." The trial court also found the State's new proofs during the second trial, which included the cell phone "location map" and H.C.'s father's identification of defendant, served to increase the complexity of the case.

12

The trial court contemplated the likelihood of any substantial difference in a subsequent trial, finding the State "confesse[d] there is no new or additional evidence to present should a third trial be ordered" and "there has been no subsequent or updated investigation of this case." The trial court made no mention of the absence of B.V.'s testimony, pursuant to Canales I, in considering the difference in proofs on retrial.

The trial court considered the relative strength of each party's case, finding our conclusions in Canales I, "both negate the testimony of B.V. and highlight what that court clearly considered to be core weaknesses in the State's case regarding identification of defendant." The trial court also stated, "[t]he findings of the Appellate Court in reversing, coupled with the information gleaned in polling the first jury, negatively impact the strength of the State's case." In its analysis, the trial court made no mention of our conclusion the State presented "substantial" evidence during the second trial, even without B.V.'s testimony. See Canales I, slip. op. at 14 ("Notwithstanding the substantial evidence already presented . . . .").

The trial court examined the professional conduct and diligence of respective counsel, finding "no issue of misconduct in either the prosecution or defense of this case." However, the trial court also described the State's expressed reasons for a third trial as "concerning," finding the State essentially

13

minimized the significance of defendant's incarceration and took a "conclusory position that defendant must be tried for a third time because he maintains an uncontrollable proclivity for criminal sexual behavior involving minors."

In reviewing the gravity of the charges and the public's concern, the trial court considered defendant's five-year incarceration during the pendency of the proceedings, recognizing "the hardships and stigmas that come with not only being charged with crimes of this nature, but also being repeatedly tried for such crimes."  The trial court set forth that the State simply sought "another chance to attempt to convict defendant" and found "it unlikely that a different result would be obtained should a third trial proceed."

The State's appeal followed, raising the following argument for our consideration:

> THE TRIAL COURT ABUSED ITS DISCRETION IN DISMISSING THE INDICTMENT ON GROUNDS OF FUNDAMENTAL FAIRNESS.

## II.

## A.

We review dismissal of an indictment for mistaken exercise of discretion since "[a] decision to dismiss an indictment is generally left to the sound discretion of the trial court . . . . "  State v. Zadroga, 255 N.J. 114, 131 (2023) (citing State v. Twiggs, 233 N.J. 513, 544 (2018)).  However, the trial court's

discretion "must be informed and guided by considerations of fundamental fairness, as well as the judiciary's responsibility for the proper overall administration of the criminal justice system." Abbati, 99 N.J. at 429. The Abbati Court further refined our standard of review as follows:

> An appellate court reviewing the decision of a trial court to dismiss an indictment with prejudice must ensure that the correct standard was employed by the trial court. Presupposing that [the applicable] threshold is met, the trial court's decision is entitled to deference for the obvious reasons that the trial court saw the witnesses and heard the testimony. The decision should be reversed on appeal only when it clearly appears that the exercise of discretion was mistaken.
>
> [Id. at 436 (citation omitted).]

"We consider the dismissal of an indictment as 'the last resort because the public interest, the rights of victims[,] and the integrity of the criminal justice system are at stake.'" State v. Reyes-Rodriguez, 480 N.J. Super. 526, 539 (App. Div. 2025) (quoting State v. Williams, 441 N.J. Super. 266, 272 (App. Div. 2015)). "Thus, a trial court should not dismiss an indictment 'except on the clearest and plainest ground.'" Ibid. (quoting State v. Ruffin, 371 N.J. Super. 371, 384 (App. Div. 2004)) (additional internal quotation marks omitted). "[T]he trial court must carefully consider the prosecutor's decision to reprosecute in reaching its conclusion regarding dismissal, and defer to it when the balance does not otherwise compel dismissal . . . ." Abbati, 99 N.J. at 434.

15

B.

The fundamental fairness doctrine derives from implied judicial authority to create appropriate and just remedies to assure the efficient administration of the criminal justice system. Id. at 427. The Court described this doctrine as "an integral part of due process" that "is often extrapolated from or implied in other constitutional guarantees." State v. Miller, 216 N.J. 40, 71 (2013) (quoting Oberhand v. Dir., Div. of Tax'n, 193 N.J. 558, 578 (2008)); see also Abbati, 99 N.J. at 429 ("Fundamental fairness can be viewed as an integral part of the right to due process.").

The doctrine is applied "sparingly" and only where the "interests involved are especially compelling" and a defendant would be subject "to oppression, harassment, or egregious deprivation." Doe v. Poritz, 142 N.J. 1, 108 (1995) (quoting State v. Yoskowitz, 116 N.J. 679, 712 (1989) (Garibaldi, J., concurring and dissenting)). The doctrine is an "elusive concept" and its "exact boundaries are undefinable." N.J. State Parole Bd. v. Byrne, 93 N.J. 192, 208-09 (1983). "For the most part, it has been employed when the scope of a particular constitutional protection has not been extended to protect a defendant."[3] Yoskowitz, 116 N.J. at 705.

---

[3] "The doctrine of double jeopardy, which protects defendants from a second prosecution for the same offense after certain terminations of an initial trial, is

The fundamental fairness doctrine does not preclude a retrial where "the elements of harassment and oppression which [are] the historic object of the constitutional and common law double jeopardy principles are not . . . present." State v. Tsoi, 217 N.J. Super. 290, 297 (App. Div. 1987). "[R]eprosecution is permissible if there was a 'manifest necessity' for the mistrial 'or the ends of public justice would otherwise be defeated.'" Dunns, 266 N.J. Super. at 363 (quoting United States v. Perez, 22 U.S. 579, 580 (1824)).

In reviewing denial of a motion to dismiss an indictment after two deadlocked juries, the Abbati Court held the "trial court may dismiss an indictment with prejudice after successive juries have failed to agree on a verdict when it determines that the chance of the State's obtaining a conviction upon further retrial is highly unlikely." Abbati, 99 N.J. at 435. In Abbati, the Court reversed and remanded to the trial court to determine whether the indictment should be dismissed, considering the following factors:

> (1) [T]he number of prior mistrials and the outcome of the juries' deliberations, so far as is known; (2) the character of prior trials in terms of length, complexity, and similarity of evidence presented; (3) the likelihood of any substantial difference in a subsequent trial, if allowed; (4) the trial court's own evaluation of the relative strength of each party's case; and (5) the

_____

[rooted in] principles of fundamental fairness . . . ." State v. Dunns, 266 N.J. Super. 349, 362 (App. Div. 1993). Defendant does not argue double jeopardy attaches here.

professional conduct and diligence of respective counsel, particularly of the prosecuting attorney.

> [Id. at 435; see also State v. Cruz, 171 N.J. 419, 430 (2002).]

The Court also explained:

> The [trial] court must also give due weight to the prosecutor's decision to reprosecute, assessing the reasons for that decision, such as the gravity of the criminal charges and the public's concern in the effective and definitive conclusion of criminal prosecutions. Conversely, the court should accord careful consideration to the status of the individual defendant and the impact of a retrial upon the defendant in terms of untoward hardship and unfairness.

> [Abbati, 99 N.J. at 435.]

We applied the Abbati factors in Dunns, to dismiss an indictment under principles of fundamental fairness after we reversed certain convictions resulting from an initial trial, and a mistrial followed months later when the State's witness refused to testify during the second trial despite incarceration for contempt. 266 N.J. Super. at 378-80. The "unusual procedural background" and fundamental unfairness that were implicated by proceeding with a third trial in Dunns are not present here. Id. at 353.

Nor does this case present the extraordinary circumstances warranting dismissal present in State v. Simmons, where a new trial was ordered through post-conviction relief eighteen years later, after the case proceeded through a

state and federal appellate "odyssey." 331 N.J. Super. 512, 515 (App. Div. 2000). The defendant was retried twice, resulting in two mistrials based upon deadlocked juries—nineteen and twenty years after the crime. Id. at 516. We concluded dismissal was uniquely appropriate where there was little chance of a conviction on a third attempt, in light of witness unavailability due to intervening deaths and health issues, along with missing physical evidence and lost transcripts of prior testimony. Id. at 523.

Here, we conclude the trial court mistakenly exercised its discretion in dismissing the indictment, finding it would be fundamentally unfair to allow the State to proceed with a third trial against defendant after one mistrial based on jury deadlock and our decision vacating defendant's conviction predicated on evidentiary error. The State's substantial evidence and differing proofs on retrial post-remand, coupled with the interests of the victims, their families, and the public in prosecuting the multi-count indictment for an alleged spree of sex offenses, primarily against minors, merits reversal.

Deference to the trial court's dismissal based on observing the witnesses and hearing the testimony, is not warranted here. The trial judge who dismissed the indictment did not preside over the first two trials, with findings on the Abbati factors based solely on a cold reading of the transcripts. We are unpersuaded the State did not have a strong case based on the evidence to be

19                                                      A-1310-23

proffered at a third trial. As the State posited, we found in <u>Canales I</u> that B.V.'s testimony proceeded at the conclusion of the State's presentation of "substantial" evidence, a fact not considered by the trial court in its written decision. Our prior conclusion as to the State's substantial evidence, even without B.V.'s testimony, belies the trial court's finding that the State does not have a strong case on retrial.

The trial court also appears to have mistakenly weighed the proposed identification testimony by H.C.'s father in a third trial against the State, where H.C. contradicted himself in the first and second trials but proffered an explanation to the jury. In addressing his inconsistent testimony, H.C.'s father stated he was nervous and had been afraid to identify defendant in the first trial, but was unable to articulate his fear. H.C.'s father also acknowledged wanting to punish defendant. However, the trial court's apparent conclusion that at a third trial the testimony of H.C.'s father will negatively impact the strength of the State's case on the issue of identification is presumptive. That credibility determination is properly left to the jury, considering the cross-examination and any contrary evidence.

We are also unpersuaded by defendant's reliance on <u>Watson</u> to argue H.C.'s testimony is inadmissible. <u>State v. Watson</u>, 254 N.J. 558 (2023). The <u>Watson</u> Court held in-court identifications not preceded by a successful out-of-court

identification may only be conducted for good reason. Id. at 579 n.1. H.C.'s father's testimony was not a "first-time in-court identification" under Watson since, prior to each of the two trials, H.C.'s father identified defendant from a photograph array.

The public's need to prosecute the indictment outweighs the prejudice to defendant. The allegations of serial sex offenses against defendant are of significant import to multiple victims, their families, and their communities. Deterrence through punishment, if guilt is established, is legislatively mandated under Megan's Law, N.J.S.A. 2C:7-1 to -23, in the public interest.

While we do not minimize defendant's prior five-year incarceration during the pendency of the proceedings, defendant's time served would be credited against any sentence he receives as the result of conviction, with the length of pre-trial detention amounting to less than the ten-year maximum sentence for a second-degree crime. Since defendant has been released on Level III pretrial monitoring, our concerns regarding continued incarceration pending trial are ameliorated. Viewed through the lens of prosecutorial deference, the balance of the community's need to prosecute allegations of serial sex offenses, primarily involving minors, and protection of the interest of victims and their families, against the prejudice to defendant, now released from incarceration, warrants reversal of the dismissal and retrial.

21

To the extent we have not addressed any of the remaining arguments, we conclude they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Reversed and remanded for trial and any further proceedings deemed necessary by the trial court. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-1310-23